IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VIGILANT INSURANCE COMPANY, as subrogee :<br>of JOHN AND BARBARA FERRARO : | CIVIL ACTION NO. 05-CV-11065 |
| : | |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| PREMIER BUILDERS, INC. and : | |
| MILNE PLUMBING AND HEATING, INC. : | |
| : | |
| Defendants. : | |

## PLAINTIFF'S MOTION TO ADMIT POST-LOSS PLACEMENT OF STEAM GENERATOR IN THE BASEMENT

## I.  INTRODUCTION AND BRIEF STATEMENT OF FACTS

Plaintiff, Vigilant Insurance Company, as subrogee of John and Barbara Ferraro, seeks

recovery for the extensive property damage sustained due to the freeze-up and rupture of a 3/8 inch

water supply line running to a steam generator for a steam shower located in the Ferraro's second

floor bathroom.  The steam generator was installed by defendants Premier (the construction

manager) and Milne (the plumber) in an unheated eave.  After the loss, defendant Milne relocated

the steam generator to the basement and routed all of the pipes in interior walls. Plaintiff anticipates

that both defendants will attempt to argue that the placement of the steam generator in the

basement is a subsequent remedial measure and inadmissible  under F.R.E. 407.  To the contrary,

the placement of the steam generator in the basement after the loss is admissible because:  1) the

defendants contest who had control over the post-loss placement of the steam generator; 2) the

defendants contest the feasibility of placing the steam generator in the basement; and  3) the

probative value of the evidence outweighs any prejudice.

## II. LEGAL ARGUMENT

### A. The Post-Loss Placement of the Generator In The Basement Is Admissible As To The Issue of Control Because The Defendants Contest Whether They Controlled The Placement of Generator

Subsequent remedial measure are not admissible to prove negligence or culpable conduct. However, subsequent remedial measure are admissible to prove control if controverted.  Clausen v. Sea-3, Inc., 21 F.3d 1181 (1st Cir. 1994); Powers v. J.B. Michael & Co., 329 F.2d 674 (6th Cir. 1964); Rioux v. Daniel Corporation, 582 F.Supp. 620 (D.Me. 1984); Hull v. Chevron, 812 F.2d 584 (10th Cir. 1987).

The critical issue in this case is who controlled placing the stream generator in the unheated eave.  Premier argues that Milne and Seimasko & Verbridge (the architect for the project) was responsible for selecting a suitable location for the generator. Conversely, Milne argues that Premier and Siemasko & Verbrige were responsible for controlling the generator's placement.

Scott Milne, the owner of Milne Plumbing denied his company's responsibility for the location of the steam generator by testifying it was either the owner's or Seimasko & Verbridge's responsibility.  [Milne Dep. pp 112-113, attached hereto as Exhibit "A"].  When questioned about the decision to place the steam generator in the eave, Mr. Milne testified Seimasko & Verbridge decided to put the generator in the eave and that his company did not control where the steam generator was located.  [Milne Dep. pp 30-31].

After the loss, Milne plumbing suggested that the steam generator be relocated in the basement.  [Milne Dep. p. 96].  Mr. Milne admitted that he suggested that it be placed in the basement and that his suggestion was followed.  [Milne Dep. p. 96].  Significantly, he testified the Seimasko did not have any input into the placement of the steam generator in the basement after the loss.  [Id.].

Premier also contests who had responsibility for control of the placement of the generator. Premier's expert admits that the generator should not have gone into the eave, but states that it was

Seimasko's and Milne's responsibility to control the placement of the generator.  [Harkness Report, p. 2, attached hereto as Exhibit "B"].

Milne and Premier dispute who had control over the placement of the generator. Thus, issues of control are controverted within the meaning of F.R.E. 407, and Milne's placement of the generator in the basement after the loss is admissible.

**B.    The Post Loss Placement of The Generator Is Admissible Because Defendants Contest The Feasibility Of The Placing The Generator In The Basement**

When a defendant contests feasibility, subsequent remedial measures are admissible.

Raymond v. Raymond Corp., 938 F.2d 1518, 1522-1523 (1st Cir. 1991) (post remedial measures not admissible when defendant stipulates to feasibility).  Feasibility under F.R.E. Rule 407 means:

> Whether something is feasible relates not only to actual possibility of operation, and its cost and convenience, but also to its ultimate utility and success in its intended performance.  That is to say, feasible means not only possible but also means capable of being utilized, or dealt with successfully." Webster's Third International Dictionary 831 (unabridged ed 1967); See Black's Law Dictionary 549 (5[th] ed 1979) (reasonable assurance of success).

Williams v. Security National Bank, 358 F.Supp. 782, 785 (N.D.Iowa 2005) *quoting* Anderson v. Malloy, 700 F.2d 1208, 1213 (8th Cir. 1982).

Plaintiff anticipates that defendants will contest the feasibility of placing the steam generator in the basement at trial.  When questioned about feasibility of placing the steam generator in the basement, Scott Milne first testified that it was feasible to put it in the basement but went further and qualified his answer.  Specifically, Mr. Milne testified that the steam generator should be placed as close to the shower as possible in order for the steam to work properly. [Milne Dep. pp. 31-32]. While Mr. Milne may mouth the words admitting feasibility, his testimony establishes that the convenience, utility and success in placing the steam generator in the basement are contested issues. In other words, Mr. Milne testified that placing the steam generator in the basement was possible, but it was more desirable to have the generator closer to the second-floor shower.  Only an

unqualified admission of feasibility would not trigger Rule 407 exception.  Mr. Milne's testimony is clearly not an unqualified admission.

Likewise, Premier's construction foreman for the Ferraro project disputes that it was feasible at the time of the original construction to place the steam generator in the basement.  Specifically, Jody Tobitt (Premier's construction foreman for the Ferraro project) testified that it was not feasible to place the generator in the basement because the construction of the interior wall and framing would not permit it. [Torbitt Dep.  pp. 33, attached hereto as Exhibit "C"][1].

### C. The Probative Value The Post-Loss Placement In The Basement Outweighs Any Prejudice

Under F.R.E. 403, unless the unfair prejudice substantially outweighs the probative value of the evidence, the evidence should be admitted. Espeaignnette v. Gene Tierney Company, Inc., 43 F.3d 1 (1st Cir. 1994) (reversing district court's exclusion of subsequent remedial measure under Rule 403); Swajian v. General Motors Corp., 916 F.2d 31, 34-35 (1st Cir. 1990) (reversing exclusion under Rule 403 in products liability action where evidence bore directly on events in issue).  Put another way, "if the party's case turns upon the introduction of the evidence, Rule 403 favors the admission of the evidence." Espeaignnette, 43 F.3d at 5-6 (*quoting* Joseph W. Cotchett and Arnold B. Elkind, Federal Courtroom Evidence, 93 (3d Ed. 1993)).  When undertaking the balancing test required by Rule 403, the district court must gauge the probative value of the testimony and weigh it against the danger of unfair prejudice.  Id.

It is axiomatic that all evidence is prejudicial; otherwise, the proponent would be unlikely to offer it at trial. Espeaignnette, 43 F.3d at 7.  Thus, the inquiry under Rule 403 is not whether the evidence is prejudicial; rather, it is whether the evidence results in unfair prejudice, meaning an

---

[1] Premier had admitted via a Response to a Request for Admission that it was feasible to place the generator in the basement.  To the extent that Milne admits but Mr. Torbitt denies that it was feasible to place the generator in the basement, the post loss placement is admissible for impeachment.  F.R.E. 407.

undue tendency to suggest a decision on an improper basis, including an emotional one. Id. *Citing* F.R.F. 403 Advisory Committee Note.

In this case, the issue of who had responsibility over the placing of the generator is critical to the defendants' liability in this case. Clearly, the defendants are going to argue at trial that they were not responsible for placing the generator and therefore had owed no duty to the plaintiffs. Furthermore, the defendants will argue at trial that Siemasko & Verbrige was responsible for the placement of the generator. The fact that Milne suggested, with Premier's approval and without the input of Siemasko & Verbrige, that the generator be placed in the basement after the loss is highly probative evidence on a crucial issue in this case. Admittedly, such evidence is prejudicial but it is not unfairly prejudicial within the meaning of Rule 403 because it does not suggest a decision on an improper basis.

The placement of the generator in the basement after a loss also goes to the crucial issue of feasibility. Defendants Milne by the testimony of Scott Milne indicated that there would be operational problems with placing the steam generator in the basement. Plaintiff should be permitted to refute such critical evidence by putting Mr. and Mrs. Ferraro on the stand to testify that the steam generator is in the basement that there is no difference in the operation of the generator from when it was in the unheated eave and when it was in the basement. Unless the defendants stipulate to, without qualification, that they had joint control over the placement of the generator and stipulate, without qualification, that it was feasible to put the generator in the basement, the placement in the basement is critical evidence on two crucial contested points at issue in this litigation.

**III.**    **CONCLUSION**

WHEREFORE, plaintiff respectfully requests that this Court permit the parties to submit

Evidence concerning placing the steam generator in the basement.

Respectfully submitted,


/s/ William N. Clark, Jr., Esquire
William N. Clark, Jr., Esquire
Cozen O'Connor
The Atrium – Third Floor
1900 Market Street
Philadelphia, PA  19103
215-665-4102

CO-COUNSEL:
Patrick J. Loftus, III, Esquire
BBO #303310
9 Park Street - Suite 500
Boston, MA  02108
(617) 723-7770

DATED:    August 16, 2006

<u>CERTIFICATE OF SERVICE</u>

I, William N. Clark, Jr., Esquire, attorney for Plaintiff, do hereby certify that a true

and exact copy of Plaintiff's Motion in Limine has been served upon counsel by electronic filing, this

16th day of August, 2006, addressed as follows:

Michael Okolita, Esquire
Law Offices of Don Feener & Assoc.
125 Front Street, Suite 310
Worchester, MA  01608-1424

John J. Jarosak, Esquire
Litchfield Cavo, LLP
6 Kimball Lane, Suite 100
Lynfield, MA  01940

John F. Gleavy, Esquire
Lynch & Lynch
45 Bristol Drive
South Easton, MA  02375

<u>/s/ William N. Clark, Jr., Esquire</u>
WILLIAM N. CLARK, JR., ESQUIRE

*EXHIBIT "A"*

1         IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

                     Civil Action No. 05-CV-11065

3

4     * * * * * * * * * * * * * * * *

                            *

5    VIGILANT INSURANCE COMPANY AS  *

     SUBROGEE OF JOHN AND BARBARA  *

6    FERRARO,                   *

                            *

7     Plaintiff,            *

                            *

8           vs              *

                            *

9    PREMIER BUILDERS, INC.,     *

     MILNE PLUMBING AND HEATING,   *

10   INC. AND SIEMASKO AND      *

     VERBRIDGE, INC.          *

11                         *

     Defendants           *

12                        *

     * * * * * * * * * * * * * * * *

13

14

15         DEPOSITION OF SCOTT MILNE,

16   a witness called on behalf of the Plaintiff

17   pursuant to the Massachusetts Rules of Civil

18   Procedure before Laura Naylor, Court Reporter

19   and Notary Public in and for the Commonwealth

20   of Massachusetts, at Litchfield Cavo, LLP,

21   6 Kimball Lane, Suite 100, Lynnfield, MA,

22   on Friday, November 11, 2005, commencing at

23   9:30 a.m.

24

25

30

1    any other locations?

2        A.    Besides?

3        Q.    Besides.

4        A.    Besides where it wound up?

5        Q.    Besides where it would up.

6        A.    No.

7        Q.    Was there any discussion about putting it

8    in the basement?

9        A.    No.

10       Q.    Was it feasible to put it in the basement?

11       A.    Yes.

12       Q.    Why weren't there discussions about putting

13   it in the basement?

14       A.    It was decided to place it on the opposite

15   side of the shower.

16       Q.    How was it decided to put it on the

17   opposite side of the shower?

18       A.    Siemasko and Verbridge made the decision.

19       Q.    Do you know whether Mr. Torbitt and

20   Siemasko and Verbridge discussed putting it in the

21   basement?

22       A.    I do not.

23       Q.    No one discussed that option with you?

24       A.    No.

25       Q.    Was there anything about the structure of

31

1    the home that wouldn't permit that?

2        A.    No.

3        Q.    And, in fact, after the loss, it was put in

4    the basement; correct?

5        A.    Yes.

6        Q.    How much additional cost was that during

7    the reconstruction to put the steam generator in the

8    basement?

9        A.    I don't have those figures in front of me.

10       Q.    Was it terribly expensive?

11           MR. JAROSAK:   Objection.

12   BY MR. CLARK:

13       Q.    Was it $5,000?

14       A.    No.

15       Q.    Was it $1,000?

16       A.    Possibly, yes.   Can I say that the

17   directions for the steam unit --

18       Q.    Sure.

19       A.    -- state that it should be placed as close

20   as possible to the unit for proper operation.

21       Q.    It also states it should be placed within

22   50 feet; correct?

23       A.    Correct.   The closer the better.

24       Q.    Is it currently within 50 feet?

25       A.    Yes.   The further away that you get from

32

1    the immediate access to the unit, the lower the

2    operating of the unit.  It doesn't provide steam as

3    well or as quickly.  It is desirable to place it as

4    close as possible to the steam unit, to the shower it

5    is providing steam to.

6        Q.   Now, the reason you didn't initially want

7    to put it on the opposite wall of the shower was that

8    that would be in an eve; correct?

9        A.   Originally there was not a cabinet built

10   for it and that was my first impression that it would

11   be placed in an eve.

12       Q.   Were you then told at some point that they

13   would build a cabinet?

14       A.   Yes.

15       Q.   Did you have any input in the decision to

16   build a cabinet?

17       A.   No.

18       Q.   Who told you that they were going to build

19   a cabinet?

20       A.   Jody Torbitt.

21       Q.   When you had those discussions with

22   Mr. Torbitt, were there any discussions concerning

23   whether the doors of the cabinets would be louvered

24   or paneled?

25       A.   I made a request that they be louvered.

96

1    BY MR. CLARK:

2        Q.   Turning now to the -- at some point after

3    the loss there was a decision made that the steam

4    generator would be moved; is that correct?

5        A.   Uh-huh.

6        Q.   Who made that decision?

7        A.   I did.

8        Q.   Did you consult with anyone concerning that

9    decision?

10       A.   Yes.

11       Q.   Who did you consult with?

12       A.   Jeffrey Fowler, Premier Builders.

13       Q.   Anyone else?

14       A.   No.

15       Q.   Did you consult with anyone from Siemasko

16   and Verbridge?

17       A.   No.

18       Q.   Was that something that was made at the

19   request of Mr. or Mrs. Ferraro or something you had

20   suggested to them?

21       A.   My suggestion.

22       Q.   And they agreed with that suggestion?

23       A.   I don't know.  I assumed so.

24       Q.   Did you suggest that to them?

25       A.   I suggested it to Jeffrey Fowler from

112

1    locations?

2         A.    Because they are in the interior of the

3    house.

4         Q.    That was to prevent any kind of freeze up,

5    is that fair to say?

6         A.    Yes.  Sure.

7         Q.    You made those suggestions to Jody.  And

8    then you heard back from Jody as to those

9    suggestions?

10        A.    Correct.

11        Q.    Do you ever remember having a meeting with

12   Jody Torbitt, Jean Verbridge, and Mrs. Ferraro

13   regarding the location of the steam generator?

14        A.    No, I do not.

15        Q.    But you suggested to Jody these two

16   interior locations.  Jody came back to you some time

17   later and told you what?

18        A.    That those were not locations that the home

19   owner and the designer, the architects wanted to use

20   and they would rather see it located in a cabinet

21   here.

22        Q.    So the suggestion of putting the steam

23   generator into the eves area, whose suggestion was

24   that as far as you understood?

25        A.    Either the owner or Siemasko and Verbridge.

113

1       Q.   And that was conveyed to you by Jody

2   Torbitt?

3       A.   Correct.

4       Q.   That wasn't your suggestion to put it in

5   the eve area?

6       A.   No.

7       Q.   And you understood from speaking to Jody

8   that wasn't his idea either?

9       A.   Correct.

10      Q.   Okay.  Once that is determined, or at least

11  it was suggested to go into the eve area, that

12  something had to be done to somehow protect the pipes

13  from freezing in that area?

14      A.   Correct.

15      Q.   That is when the decision was made to put a

16  cabinet into that space?

17      A.   Correct.

18      Q.   Was there any discussions that you had with

19  Jody Torbitt or anyone else at Premier about what

20  needed to be done with regard to that cabinet to

21  prevent any kind of freeze ups?

22      A.   Yes.

23      Q.   What sort of discussions did you have with

24  either Jody or anyone else at Premier --

25      A.   That it would be -- I'm sorry.

*EXHIBIT "B"*



**Albert Harkness & Associates, Inc.**
Architects and Code Consultants

Email
tito.harkness@harknessarch.com

2 Central Street
Ipswich, Massachusetts 01938

Telephone: (978) 356-9058
Facsimile:  (978) 356-2566

May 9, 2006

Michael Okolita, Esq.
Donald E. Feener & Associates
120 Front Street, Suite 310
Worcester, MA 01608-1424

Re:     Vigilant/Ferraro vs. Premier Builders, Inc et al.

|  |  |
|---|---|
| Date of loss: | 2/4/2005 |
| Location: | 136 Hesperus Ave. |
|  | Magnolia, MA |
| Occupancy: | Single family dwelling |

Dear Mr. Okolita:

As requested, I have reviewed documents relative to the above referenced claim.  In addition, I met with Kenneth Kumph and reviewed the architect's plans for the house.

Based on the information currently available, I agree with plaintiff expert David Cowen's opinion that the steam generator cabinet was located in an unheated eave space, and that inadequate provision was made to provide sufficient heat inside the cabinet to prevent freeze-ups.

Based on my understanding of the facts, the following factors appear to have been particularly relevant to the loss in question:

1. The Steam generator cabinet was located in a ventilated eave space which was directly under the roof and over the soffit of an exterior porch.

2. The walls separating the cabinet from heated space were insulated.

3. No radiant or hot-air heat was provided inside the cabinet.

4. The cabinet doors were not louvered.

5. Access to the cabinet was through an enclosed toilet room.  The toilet room had radiant heat, but no hot air heat register.  It is not known if the toilet room door was shut when the Ferraro family left for vacation.

5/9/2006
Page 2

6. The thermostats for the radiant and hot-air heating were in locations which were not subject to comparable heat loss conditions to the toilet room or the steam generator cabinet.

The primary factors which led to the frozen pipe were design errors. The architect was responsible for the design of the building. The architectural plans did not provide space for the location of the steam generator. Although it appears that the architect's representation on the site during construction was provided primarily by interior designers, the architect's office was responsible for reviewing and approving changes to the design which occurred during construction. Regardless of the extent to which the architect's representative participated in the decision to locate the steam generator in the eave, the architect had a duty to inform himself of such decisions and ultimately approve the location of the generator.

Even if the owners objected to losing closet space or louvered doors at the cabinet enclosure, the architect was responsible for providing a viable design for the location of the steam generator. If the owners insisted on a design which in his opinion exposed the piping to the possibility of freezing, then the architect had a duty to object and inform the owners of the potential consequences.

The architect delegated design of the heating system to the plumbing and HVAC subcontractors. The plumbing and HVAC subcontractors therefore assumed the responsibility for designing the heating system so that all areas were adequately heated, and the heat zoning and thermostat locations were designed to heat all areas of the building during foreseeable conditions.

In addition, the plumbing contractor was specifically responsible under the Massachusetts Plumbing Code for locating and protecting pipes from freezing.

The basis for Mr. Cowen's opinion that the generator cabinet was inadequately insulated and/or sealed is not known, since it is my understanding that the cabinet has not been available for inspection. I am not aware of any witness testimony indicating that the cabinet was insufficiently insulated or drafty prior to the loss and the associated emergency repairs.

Insulation can slow the rate of heat loss, but cannot generate heat; in the absence of an adequate source of heat, the interior of the most perfectly insulated cabinet will eventually get cold enough to freeze.

Based on the above, it is my opinion that the decision to locate the steam generator in an unheated eave space which was located under an exposed roof and over an exposed soffit, while making no adequate provision for supplemental heating within the cabinet, made it highly likely if not inevitable that a freeze-up would occur sooner or later.

I reserve the right to supplement the above opinions in light of any new information which may become available.

5/9/2006
Page 3


Please call me if you have any further questions.


Very truly yours,

Albert (Tito) Harkness III



**Albert Harkness & Associates, Inc.**
Architects and Code Consultants

2 Central Street                                        Telephone: (978) 356-9058
Ipswich, Massachusetts 01938                            Facsmile:  (978) 356-2566

**Albert (Tito) Harkness III, AIA**

**Education:**

> Harvard Graduate School of Design
> M.Arch. 1971
>
> Harvard College
> A.B. 1963

**Architectural Registrations:**

> Massachusetts (1973)
> Connecticut (1985)
> New Hampshire (1985)
> Maine (1985)
> Rhode Island (1976)
> New Jersey (1988)
> New York (1985)

**Work experience:**

1987-Present
> Albert Harkness & Associates, Inc. (Incorporated 1/1/94)
> Ipswich, MA
>
> Private practice, including architectural design and consulting with regard to building
> codes, premises liability, construction safety, and building envelope defects.

1986-1987
> Principal
> Lindentree Corp. (Design-Build)
> Hamilton, MA

1983-1986
> Vice President
> The Carlson Group, Inc. (Design-Build)
> Cochituate, MA

**1982-1983**
> Project Architect
> The Stewart Design Group
> Boston, MA

**1976-1982**
> Partner
> Harkness & Wick, Architects
> Harkness & Wick Development Corp. (Design-Build)
> Boston, MA

**1973-1975**
> Project Designer
> Sumner Schein, Architects
> Boston, MA

**1972-1973**
> Construction Supervisor
> Housing Innovations, Inc.
> Boston, MA

**1971-1972**
> Designer
> Perry, Dean & Stewart
> Boston, MA

**1963-1966**
> Lieutenant
> U.S. Marine Corps

**Organizations and Affiliations:**

> American Institute of Architects
> Boston Society of Architects
> > Building Envelope Subcommittee
> National Council of Architectural Registration Boards (NCARB)
> Construction Specifications Institute
> International Code Council
> American Society of Testing and Materials (ASTM)
> National Fire Protection Association
> Ipswich Development Review Committee

**Teaching:**

> Boston Architectural Center, Senior Thesis Project Advisor

**Publications:**

> Various articles in professional journals.

*EXHIBIT "C"*

1         IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS

2

                   Civil Action No. 05-CV-11065

3

4   * * * * * * * * * * * * * * * *
                           *

5   VIGILANT INSURANCE COMPANY AS  *   **ORIGINAL**
    SUBROGEE OF JOHN AND BARBARA  *

6   FERRARO,                   *
                             *

7    Plaintiff,            *
                           *

8          vs               *
                           *

9   PREMIER BUILDERS, INC.,      *
    MILNE PLUMBING AND HEATING,   *

10  INC. AND SIEMASKO AND      *
    VERBRIDGE, INC.          *

11                          *
    Defendants           *

12                          *
   * * * * * * * * * * * * * * * *

13

14

15         DEPOSITION OF JODY TORBITT,

16  a witness called on behalf of the Plaintiff

17  pursuant to the Massachusetts Rules of Civil

18  Procedure before Laura Naylor, Court Reporter

19  and Notary Public in and for the Commonwealth

20  of Massachusetts, at Premier Builders, Inc.

21  113 Jewett Street, Georgetown, MA, on Thursday,

22  November 10, 2005, commencing at 2:00 p.m.

23

24

25

33

1      A.   Yes.

2      Q.   Tell me what you remember about those

3  discussions.

4      A.   The routing was an issue.  The structure

5  wouldn't allow it.

6      Q.   If the structure would have allowed it,

7  would that have been the preferred way to handle

8  this?

9      A.   Yes.

10      Q.   And that's because of the freeze hazard;

11  correct?

12      A.   Yes.

13      Q.   In addition to the radiant heat, there was

14  also forced air, forced air heat, is that what it

15  was, or was it baseboard heat?

16      A.   Forced air heat.

17      Q.   Forced air heat.  Were there forced air

18  heat vents in the bathrooms?

19      A.   Yes.

20      Q.   The radiant heat, was that just for the

21  bathrooms?

22      A.   Yes.  Actually, it was for the entry floor

23  as well.

24      Q.   For the entry floor.  The radiant heat,

25  does that have the -- I know it is supposed to warm