IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| VIGILANT INSURANCE COMPANY, as subrogee of JOHN AND BARBARA FERRARO | : | CIVIL ACTION NO. 05-CV-11065 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PREMIER BUILDERS, INC. and MILNE PLUMBING AND HEATING, INC. | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE/ARGUMENT
THAT THE FREEZE-UP WAS CAUSED BY THE FERRAROS
TURNING DOWN THE THERMOSTATS**

I.    **INTRODUCTION**

Plaintiff, Vigilant Insurance Company, as subrogee of John and Barbara Ferraro, seeks

recovery for the extensive property damage sustained due to the freeze-up and rupture of a 3/8 inch

water supply line running to a steam generator for a steam shower located in a second floor

bathroom.  The steam generator had been installed by defendants Premier and Milne in an unheated

eave.  Plaintiff anticipates that defendants will seek argue or attempt to introduce evidence that the

Ferraros set the thermostats below 60°F.

The defendants cannot argue or introduce evidence that the Ferraros set the thermostats in

their home below 60°F because: 1) the one occasion that the Ferraros allegedly turned down the

thermostats below 60°F is inadmissible prior act evidence; and 2) there is no evidence proving that

turning the thermostats below 60°F caused the freeze-up; 3) there is no legally admissible evidence

that that the thermostats were turned down below 60°F at the time of the freeze-up.

II.    **BRIEF STATEMENT OF FACTS**

The Ferraro residence is a custom designed and built home.  Construction of the residence

began in 2001.  The Ferraros moved into the home in July of 2003.

The Ferraros hired Siemasko & Verbridge ("S&V")to design the house.[1]  Siemasko

recommended that the Ferraros hire Premier Builders as the general contractor.  Based on

Siemasko's advice and after meeting with Premier, the Ferraros hired Premier.  Milne Plumbing was

the plumbing subcontractor for the project.

The Ferraros wanted a steam shower in their daughter Claire's bathroom.  A stream shower

requires a stream generator to create the steam that is piped into the shower enclosure.   Premier and

Milne decided to install the generator in an unheated eave located adjacent to the shower stall and

adjacent to the commode room of Claire's bathroom.  When they decided to place it in the eave,

they recognized that placing it in the unheated eave was a freeze hazard.  Accordingly, to prevent

freezing, they decided to cut a hole in the wall of Claire's commode room, install a box in the

unheated eave, place the generator and water lines in the box to prevent heat loss and to install

louvered doors to allow ambient heat from the bathroom to the box.

However, louvered doors were rejected as an option. Instead, Premier installed regular doors

to the box, effectively sealing the unheated box from the heat in the bathroom. Predictably, in only

the second winter after construction of the house was completed, the water supply line running to

the generator froze in late January/early February 2005.

In their defense of this action, counsel for defendants and the witnesses for defendants have

been attempting to argue, without factual support, that Mr. and Mrs. Ferraro turned down the heat

to their home and turning down the heat caused the freeze-up.  In support of their misplaced

defense, the defendants cite to an incident during the prior winter when the defendants allegedly saw

---

[1] Siemasko and Verbridge is a party to this lawsuit. Plaintiff has settled with Siemasko and Verbridge
and expects to dismiss Siemasko & Verbridge from this case by August 30, 2006.

that the thermostats were allegedly turned down to an unspecified temperature below 60F.  For the

reasons set forth below, the alleged prior turning down of the thermostats and any argument that he

Ferraros turned down the thermostats are inadmissible.

## III.    LEGAL ARGUMENT

### A.    The Time That The Ferraros Allegedly Turned The Heat Below 60°F Is Inadmissible Prior Act Evidence Under Federal Rule of Evidence 404(b)

F.R.E. 404(b) provides in relevant part:

> Other crimes, wrongs, or acts. – Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action or conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence or mistake or accident…

Rule 404(b) precludes the admission of other actions of a party to show that a party acted in

a certain way.  DiRico v. City of Quincy, 404 F.3d 464 (1st Cir. 2005);  Bonilla v. Yamaha Motors

Corp., 955 F.2d 150 (1st Cir. 1992). As stated by one court: "It is well settled that prior acts may not

be admitted to prove that a person acted in a similar fashion in the case at hand."  Lataille v. Ponte,

754 F.2d 33, 35 (1st Cir. 1985).

In Bonilla, the plaintiff was injured in a motorcycle accident. The plaintiff sued Yamaha

alleging that a brake failure caused the accident.  Yamaha defended the case by arguing that the

plaintiff's excessive speed caused the accident and not a defect with the brakes.

During trial, the court permitted Yamaha to cross examine the plaintiff concerning other

acts of speeding.  After the plaintiff denied speeding, the trial court permitted the defendant to

introduce evidence of two speeding convictions.

The United States Court for the First Circuit reversed on the grounds that the trial court

should not have admitted the other speeding acts because the acts were inadmissible under Rule

404(b).  The Bonilla court held that the trial court abused its discretion in admitting the evidence.

Specifically, the <u>Bonilla</u> court held that Yamaha had no right to question the plaintiff about two

speeding violations simply in the hope that the plaintiff would deny them, thus opening up the red

herring for impeachment purposes.  The <u>Bonilla</u> court concluded that because the plaintiff's other

conduct was not within the permissive use of 404(B), the trial court abused its discretion in

permitting cross- examination on the speeding violations and later in admitting a document that

showed that the plaintiff had been fined for speeding.  <u>Bonilla</u>, 955 F.2d at 153.

A similar result was reached in <u>Connelly v. Hyundai Motor Corp.</u>, 351 F.3d 535 (1st Cir.

2003).  In <u>Connelly</u>, a minor was killed in a traffic accident by an air bag when the child was a

passenger in the front seat of a car.  Hyundai attempted to introduce evidence that the driver of the

car had two prior citations for permitting the minor to ride in a car without a fastened seatbelt.  The

district court excluded the evidence and the United Stated Court of Appeals for the First Circuit

affirmed the exclusion of the evidence.  <u>Connelly</u>, 351 F.3d at 537.  In affirming the district court,

the First Circuit held:

> Evidence that Mr. Cabrera had been cited for failing to seatbelt
> Eduardo on two prior occasions suggests only that he likely failed to
> seatbelt Eduardo on the date of the accident. But use of Mr.
> Cabrera's prior acts for this purpose is prohibited by Fed. R. Evid.
> 404(b).

<u>Connelly</u>, 351 F.3d at 537.

In this case, any evidence of other occasions when the Ferraros allegedly turned down the

temperature setting the thermostats below 60°F is prior act evidence that is specifically forbidden

under Rule 404(b).  The exclusive purpose for introducing the alleged prior acts of turning down the

thermostat is to prove that the Ferraros turned down the thermostats in the winter of 04/05 and

caused this loss.  Like the speeding violations in <u>Bonilla</u> and the seatbelt violations in <u>Connelly</u>,

turning down the thermostats below 60°F on other occasions is inadmissible.  Furthermore, the

alleged lowering of the temperature on prior occasions is not even admissible for cross-examination

purposes.  <u>Bonilla</u>, 955 F.2d 150, 152.

**B.    Assuming Arguendo That The Ferraros Turned The Thermostats Down Below 60°F, Such Evidence Is Inadmissible Because It Has No Tendency To Prove or Disprove Comparative Fault or Causation**

Federal Rules of Evidence 401 and 402 address relevancy and are the cornerstones for the admission of evidence.  Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Pursuant to Rule 402, "[e]vidence which is not relevant is not admissible."  Moreover, Rule 403 permits the Court to exclude relevant evidence which it determines to be confusing, misleading, or unfairly prejudicial to the opposing party.

General acts of negligence that do not actively or proximately cause an accident cannot support a claim of negligence or comparative fault.  Cannon v. Sears, Roebuck and Co., 374 N.E.2d 582, 374 Mass. 739 (1978); Gregory v. Main Central Railroad Co., 59 N.E.2d 471, 317 Mass. 636 (1975).  Put another way, "negligence or other misconduct which does not contribute to some extent to injury is without legal consequence."  Gregory, 59 N.E.2d at 472.   For example, in the context of whether a statutory violation is admissible as evidence of negligence, the Supreme Judicial Court of Massachusetts held that a statutory violation has no evidentiary value unless there is a casual relationship between the violation and the accident.  Hullem v. Commonwealth, 487 N.E.2d 477, 396 Mass. 1009 (1986); Sullivan v. Griffin, 61 N.E.2d 330, 318 Mass. 359 (1945).  As summarized by the court "a statutory violation cannot be considered as evidence of negligence unless there is a causal relationship between the violation and harm."  Hullem, 487 N.E.2d 478.

It is also well established that when an issue is outside of the scope of a layman's expertise, expert testimony is required to explain certain evidence prior to the admission of that evidence.  Triangle Dress, Inc. v. Bay State Electric Service, Inc., 252 N.E.2d 887 (Mass 1966).

Even if the Ferraros did turn down the thermostat below 60°F, the defendants have not and cannot proffer any evidence that setting the thermostats below 60°F caused the freeze-up. The

absence of supporting expert testimony that setting the thermostats below 60°F is at least a contributing cause of the freeze-up is fatal to the admission of any evidence or any argument that the Ferraros are at fault for setting the thermostats below 60°F. Without the necessary expert predicate that the freeze-up would not have occurred had the thermostats been set above 60°F, the defendants cannot show the required casual link that would make such testimony relevant. The alleged setting of the thermostats below 60°F is just a general act of evidence that is inadmissible and irrelevant at trial. Therefore, any evidence or argument that the thermostats were set below 60°F are inadmissible.

### C.  There Is No Evidence That The Thermostats Were Set Below 60°F At The Time of the Freeze-up

The defendants have no evidence that the thermostats were turned down below 60F. To the contrary, the unrefuted testimony is that the in the winter of the loss, the forced hot air thermostats were set at 62F (or above) and that the radiant heat thermostats were set at 88F. [John Ferraro Dep. pp. 188-189 (attached hereto as Exhibit "A"; Barbara Ferraro Dep. pp. 57, 81 (attached hereto as Exhibit "B")] . Indeed, when Mr. Ferraro first discovered the water leak he looked at the thermostats and confirmed that they were set at 62F, the same setting as when he left thirteen days before. [John Ferraro Dep. pp. 100-101].

During the depositions of the defense witnesses, there was some speculation that Mrs. Ferraro may have turned down the heat and that may have contributed to the freezing of the pipe. However, when questioned about what evidence they had that the thermostats were turned down, the defense witnesses could not offer any factual support their self-serving opinions. [Milne Dep. pp. 106 (attached hereto as Exhibit "C")]. There are only two things that the defense witnesses testified about that even arguably support their argument that the thermostats were set below 60°F. First, the witnesses testified that the hear that Mrs. Ferraro turned down the thermostats. These statement as are inadmissible as hearsay. Second, the defense witnesses testified that on one

occasion during the winter prior to the loss, they allegedly saw the thermostats set below 60°F.  This testimony is inadmissible prior act evidence under F.R.E. 404(b). See Argument A, *Supra.* Accordingly, plaintiff respectfully requests this Court to preclude counsel from arguing or attempting to introduce evidence that the thermostats were lowered at the time of the freeze-up.


IV.    **CONCLUSION**

WHEREFORE, plaintiff respectfully requests that this Court preclude defendants from introducing any evidence or argument that the Ferraros turned down the thermostats.


Respectfully submitted,

Plaintiff Federal Insurance Company, by

 Its Attorneys,


/s/ William N. Clark, Jr., Esquire
WILLIAM N. CLARK, JR, ESQUIRE
Cozen O'Connor
The Atrium – Third Floor
1900 Market Street
Philadelphia, PA  19103
215-665-4102

CO-COUNSEL:
Patrick J. Loftus, III, Esquire
BBO #303310
9 Park Street - Suite 500
Boston, MA  02108
(617) 723-7770

DATED:    August 16, 2006

CERTIFICATE OF SERVICE

I, William N. Clark, Jr., Esquire, attorney for Plaintiff, do hereby certify that a true

and exact copy of Plaintiff's Motion in Limine has been served upon counsel by electronic filing, this

16th  day of August, 2006, addressed as follows:

Michael Okolita, Esquire
Law Offices of Don Feener & Assoc.
125 Front Street, Suite 310
Worchester, MA  01608-1424

John J. Jarosak, Esquire
Litchfield Cavo, LLP
6 Kimball Lane, Suite 100
Lynfield, MA  01940

John F. Gleavy, Esquire
Lynch & Lynch
45 Bristol Drive
South Easton, MA  02375

/s/ William N. Clark, Jr., Esquire
WILLIAM N. CLARK, JR., ESQUIRE

*EXHIBIT "A"*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. NO. 05-CV-11065

VIGILANT INSURANCE
COMPANY, as subrogee of
JOHN and BARBARA FERRARO,

Plaintiffs,

VS.

PREMIER BUILDERS, INC.,
MILNE PLUMBING AND
HEATING, INC., and SIEMASKO
AND VERBRIDGE, INC.

Defendants.

---

**DEPOSITION OF**

**JOHN FERRARO**

November 21, 2005
9:30 a.m.

Litchfield Cavo, LLP
6 Kimball Lane, Suite 100
Lynnfield, MA 01940-2682

Cheryl P. Burns, Professional Court Reporter
and Notary Public in and for the
Commonwealth of Massachusetts



**Jack Daniel**
**Court Reporting & Video Services** Inc

Technologies you can use • Experience you can Trust

141 Portland Street, Suite 200, Boston, Massachusetts 02114
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Fax: 617.557.0040
www.jackdanielreporting.com

97

1  on and the doors open, in the fall; maybe
2  it was even in the winter before they
3  would have had it cranked way up in the
4  80's and stuff.  And we'd talk about,
5  Don't be turning the air-conditioner on
6  and leaving the doors open.  We're on the
7  ocean, we'd never use the air conditioner.
8  So we'd talk about those kinds of things
9  with Premier.
10   Q.  I guess my question was, prior to
11  February of 2005, did you receive any
12  instruction from anyone at Premier or
13  Milne about where the thermostats in the
14  house should be set, either a minimum or
15  maximum?
16   A.  No.
17   Q.  Did you receive any such
18  instruction from anyone from Siemasko and
19  Verbridge?
20   A.  No, absolutely not.
21   Q.  Do you have any knowledge one way
22  or the other, Mr. Ferraro, if anyone,
23  whether it was someone from Premier or
24  anyone else entered the home from the time

98

1  you left 12 to 13 days before you left
2  February 4, 2005 and your return?
3   A.  I have no knowledge of any anyone
4  entering the home.
5   Q.  In any follow-up conversation with
6  anyone at Premier after the loss, did
7  anyone from Premier indicate to you that
8  they had gone in during that time frame
9  when you were away?
10   A.  No.
11   Q.  Now, you returned late in the
12  evening on February 4, 2005, who was with
13  you if anyone?
14   A.  My son.
15   Q.  Where was Mrs. Ferraro?
16   A.  New York City.
17   Q.  Your daughter?
18   A.  New York City.
19   Q.  When you arrived at the home that
20  evening, what did you see?
21   A.  I walked in the back door, you
22  know, there was like a sauna almost.
23  There was a lot of moisture in the air.
24  I walked around the corner and ceiling was

99

1  down over the island in the kitchen; there
2  was some ceiling that fell over the bar
3  area.  There was water on the floor and
4  parts of that area.  And, you know, drops
5  were coming from the sealing, that kind of
6  thing.
7   Q.  Were there particular rooms where
8  the drops were coming from the sealing?
9   A.  Yes.
10   Q.  Which rooms?
11   A.  The bar, the kitchen and parts of
12  the family room, kitchen area.
13   Q.  When you say drops were coming
14  through the ceiling, was it like --
15   A.  It was obviously half -- not half,
16  the ceiling but pieces of the ceiling were
17  down over the kitchen area and the bar
18  island area.  And you just saw water.
19  But you couldn't tell, I remember because
20  I went upstairs, you couldn't tell if the
21  water was coming or it was moisture from
22  the condensation in the house.
23   Q.  When you walked into the home --
24  Strike that.

100

1    Did you drive up from New York to
2  get back to the house?
3   A.  No.  I think I testified I flew in
4  from -- I can go back and check my
5  records and confirm it --
6   Q.  This was your trip to Chicago and
7  Brazil?
8   A.  It started in Brazil, went to
9  Denver, then on to Chicago.
10   Q.  Did your son fly in with you?
11   A.  No, he lives in Boston.  He goes
12  to boarding school at Concord Academy.  I
13  picked him up and we drove out to the
14  house.
15   Q.  When you walk into the home from
16  the back door, was it cold in the home?
17   A.  No.  The first thing I checked was
18  the thermostats when I saw the water.
19   Q.  What did you observe when you
20  checked the thermostats?
21   A.  Sixty-two-degree setting and
22  62-degree room temperature.
23   Q.  Did you check all of the
24  thermostats that you listed for us?

25  (Pages 97 to 100)



Jack Daniel
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts  02114

| 101 | 103 |
|---|---|
| 1    A. I went upstairs, looked at the one<br>2  outside Clare's bathroom and it said the<br>3  same thing, 62. My bedroom, 62. Went<br>4  downstairs to the living room thermostat,<br>5  70.<br>6    Q. So everything was as you had left<br>7  it?<br>8    A. Yes.<br>9    Q. After you made these initial<br>10  observations, what did you next, Mr.<br>11  Ferraro?<br>12    A. I went searching for where the leak<br>13  was and quickly established it was up in<br>14  my daughter's bedroom -- bathroom. Sorry.<br>15  Excuse me. Went behind to see where it<br>16  was leaking and heard the "sss" coming of<br>17  the closet where the steam unit was.<br>18    Q. What did you do then, sir?<br>19    A. I went down to the basement and<br>20  shut the main off.<br>21    Q. How did you know that the main was<br>22  located in the basement? In other words,<br>23  had you received some instruction about<br>24  that when you were getting the house? | 1    A. I said, Ken, we have a problem<br>2  here. And he said, I'm sorry. That's<br>3  terrible. I think he said Let me call --<br>4  I can't remember exactly what he said, but<br>5  I do remember this, that somehow Scott<br>6  called me or I called Scott Milne or I<br>7  called him and Scott was very upset and<br>8  sorry about it. And I said, Well, don't<br>9  worry about it. He wanted to come over<br>10  to the house and look at it. And I told<br>11  him, I shut the main off, it's not coming<br>12  out. My son and I are just going to bed,<br>13  why don't you come over in the morning.<br>14    And he said, I'll come now. I'm<br>15  come now. And I said, It's late. There<br>16  is no reason to come now. You're not<br>17  going to do anything now. Just come first<br>18  thing in the morning to figure it out.<br>19  Then he told me he had somebody that's<br>20  really good at cleaning up fast so you can<br>21  protect your belongings and he would get<br>22  them there in the morning. I think he<br>23  said it was Clean Pro. He said he would<br>24  take care of getting those people there |

| 102 | 104 |
|---|---|
| 1    A. No, but I mean --<br>2    Q. It was something you just knew?<br>3    A. Yes. There is a utility room in<br>4  the basement where the water comes in.<br>5  It's got a big handle.<br>6    Q. After you shut the water main off,<br>7  what did you do next?<br>8    A. Called my wife, called Premier and<br>9  I think either I called or Scott Milne<br>10  called me and I'm not sure what order I<br>11  did those three things.<br>12    Q. Were you able to get somebody when<br>13  you called Premier?<br>14    A. Yes. I can't remember if I had to<br>15  leave a message on Kenny's cell or how<br>16  this happened. But I spoke that night to<br>17  my wife, Kenny and Scott.<br>18    Q. Do you have any conversation of<br>19  where Mr. Kumph was when you spoke with<br>20  him?<br>21    A. No.<br>22    Q. What did you say to Mr. Kumph and<br>23  what did he say to you when you first<br>24  called? | 1  first thing in the morning to help clean<br>2  it up.<br>3    So that was the gist of the<br>4  discussion with Scott and there was a<br>5  similar discussion that Kenny would be<br>6  over in the morning or Paul would be over<br>7  in the morning. I think he had someone<br>8  there in the morning and that's what he<br>9  said. And I said, That's fine, and I<br>10  called my wife and my -- was coming up<br>11  the next morning, as well.<br>12    Q. Did you call anyone from Siemasko<br>13  and Verbridge that night?<br>14    A. No.<br>15    Q. After having these phone calls with<br>16  the people you just mentioned, Mr. Kumph,<br>17  Mr. Milne and your wife, did you contact<br>18  anyone else that evening?<br>19    A. I sent an e-mail to my secretary.<br>20    Q. Advising her what?<br>21    A. Just that I needed to talk to her<br>22  in the morning and that I needed to find<br>23  -- I think I was missing -- I was<br>24  supposed to get a FedEx and I was missing |

26 (Pages 101 to 104)



Jack Daniel
Court Reporting & Video Services Inc

Technologies you can use • Experience you can Trust

Direct Dial:   617.557.0039
Toll Free:    866.814.0039
Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

| 185 | 187 |
|---|---|
| 1 think? | 1 he say that extra insulation would be |
| 2 A. I don't know exactly where they | 2 added to prevent further freezing? |
| 3 are. I think Barbara kept them in the | 3 A. It was Jody from Premier and Jody |
| 4 house, so we'll ask her. | 4 was on-site trying to figure out why the |
| 5 Q. Just about done here. | 5 pipes were freezing. He did some things |
| 6 With regard to this issue with a | 6 immediately like pull the cabinet out of |
| 7 draft in the cabinet, that's something | 7 the wall in our bathroom and putting a |
| 8 that you've been told about? | 8 heater in there during this period. And |
| 9 A. Yes. | 9 then they were looking at the long term |
| 10 Q. This is the cabinet with the steam | 10 solution. They talked about wrapping |
| 11 generator, you, yourself never observed | 11 pipes and what we could do to make sure |
| 12 such a draft, did you? | 12 these things don't freeze. I don't recall |
| 13 A. Not that I would recall. | 13 the specifics of all the options but I do |
| 14 MR. OKOLITA: Nothing more. | 14 recall having long discussions about |
| 15 THE WITNESS: Can we take a | 15 insulation, wrapping pipes, putting heaters |
| 16 break? | 16 -- I guess you can put heaters in certain |
| 17 (Short break taken). | 17 spots, enclosing certain things more; that |
| 18 MR. JAROSAK: Back on the | 18 kind of thing. |
| 19 record. | 19 Q. I know at the time of the loss it |
| 20 EXAMINATION | 20 was the house rule to keep the radiant |
| 21 BY-MR.GLEAVY: | 21 heat at a constant temperature. Was that |
| 22 Q. My name is John Gleavy. The night | 22 always the standard since the date you |
| 23 you came home, the night you discovered | 23 occupied the house? |
| 24 the loss, what was the temperature outside | 24 A. No. |

| 186 | 188 |
|---|---|
| 1 that night? | 1 Q. Initially, what was of practice of |
| 2 A. I don't recall. | 2 the keeping the radiant heat? |
| 3 Q. Generally, do you remember the | 3 A. Again, you'll to have to ask my |
| 4 weather? | 4 wife, but I remember in the first year, |
| 5 A. I don't really recall. I mean, it | 5 having a lots of trouble with the radiant |
| 6 was winter and I recall some snow on the | 6 -- even figuring out how to set it, |
| 7 ground but I don't really recall. | 7 knowing what to set it at, even turning |
| 8 Q. Fair to say it was cold out. | 8 them back or you didn't turn them back |
| 9 A. Yes, it was definitely winter. | 9 when you were out of the house, did you |
| 10 Q. When you went into Clare's bathroom | 10 want the floors toasty when you weren't in |
| 11 that night for the first time, was it | 11 the house; that kind of thing. So it was |
| 12 colder than the rest of the house? | 12 something that we came to that second year |
| 13 A. Not that I recalled. | 13 and, you know, I remember having many |
| 14 Q. When you went into the cabinet | 14 discussions with my wife about what's up |
| 15 where the generator was located, did you | 15 with this radiant heat, how does it work |
| 16 notice if that was cold? | 16 and that culminated in her getting a |
| 17 A. I didn't, but you'd have to also | 17 special meeting about it, and how to work |
| 18 appreciate the water is coming in spraying | 18 the thermostats work. |
| 19 and I didn't notice any degree change like | 19 Q. When the determination was made to |
| 20 when you'd walked upstairs and get to | 20 keep it at a constant temperature, do you |
| 21 Clare's bathroom and now, I understand, | 21 know what that temperature was? |
| 22 something is wrong in part of the house. | 22 A. It wasn't constant, it was |
| 23 Q. Regarding that prior's winter's | 23 somewhere between 88 and low 90's. And it |
| 24 freezing was it Jody from Premier -- did | 24 was basically something that my wife |

47 (Pages 185 to 188)



**Jack Daniel**
**Court Reporting & Video Services** Inc.
Technologies you can use • Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

| 189 | | 191 | |
|---|---|---|---|
| 1 | worked out and I was told not to touch | 1 | that you get in. |
| 2 | them. | 2 | Q. You mean, through the cabinet? |
| 3 | Q. If you looked at the one of the | 3 | A. Yes. |
| 4 | thermostats of the radiant heat, it would | 4 | Q. Do you know if the back of that |
| 5 | read from 88 to 90 degrees? | 5 | cabinet was removable? |
| 6 | A. Somewhere in that range. She can | 6 | A. The back that goes along the eave |
| 7 | tell you, but I don't touch them. I'm | 7 | side? |
| 8 | told not to touch them and I don't touch | 8 | Q. Correct. |
| 9 | them. | 9 | A. I don't know. |
| 10 | Q. You described the interior of the | 10 | Q. You so you don't know what type of |
| 11 | cabinet as far as you know it, did you | 11 | insulation was on the backside of that |
| 12 | ever see behind the cabinet area? | 12 | cabinet? |
| 13 | A. How could you see behind? | 13 | A. No. |
| 14 | Q. Well, there's eaves back there; | 14 | Q. After the loss, did anyone ever |
| 15 | correct? | 15 | indicate to you that they thought the |
| 16 | A. Well, if you open the door there is | 16 | problem was caused by work done by Milne |
| 17 | the cabinet and if you look in, it's | 17 | Plumbing other than your attorney? |
| 18 | basically like a cave. | 18 | A. My wife and I had had some |
| 19 | Q. Do you know any other way to get | 19 | discussions whether there was a frozen |
| 20 | into that eaves area? | 20 | pipe or whether the pipe was degraded, but |
| 21 | A. Not without braking down walls or | 21 | you know, again, there was nobody who told |
| 22 | floors or roof. | 22 | us this is why it happened. And there |
| 23 | Q. After that cabinet was built, did | 23 | was no indication, you know, other than |
| 24 | you ever look at the eaves area behind the | 24 | people saying gee, I wonder why this |

| 190 | | 192 | |
|---|---|---|---|
| 1 | cabinet? | 1 | happened which was the subject of great |
| 2 | A. Before the wall was up? | 2 | questions. My view is this going to tell |
| 3 | Q. After the cabinet was built that | 3 | us. You guys -- I'm waiting to hear as |
| 4 | holds the steam generator, did you ever | 4 | you look at different options what is the |
| 5 | get look in the area behind it? | 5 | reason, but I don't know. |
| 6 | A. How would I, if once the cabinet | 6 | Q. What was -- the manufacturer's |
| 7 | was in and the walls were up and the roof | 7 | representative for the steam generator that |
| 8 | on, no. | 8 | came out to the house? |
| 9 | Q. In your prior testimony I thought | 9 | A. Yes. |
| 10 | there was some testimony that you can | 10 | Q. What time was that? |
| 11 | access that maybe through one of the | 11 | A. I don't know. My wife would be |
| 12 | closets in one of the bedrooms? | 12 | able to give you the details. It was |
| 13 | A. Well, you'd have to rip down the | 13 | when we were worried that it was too hot |
| 14 | wall in the closet, on the other side -- | 14 | -- even on the low setting it was too hot |
| 15 | the only way you can get back in there | 15 | in the steam shower. |
| 16 | would be through the roof, through the | 16 | Q. Was that before you had a problem |
| 17 | shower which you're not going to take the | 17 | with the floor overheating in the area |
| 18 | tile off, or in the other room there is a | 18 | over the pipe? |
| 19 | built-in cabinet and I think that's up | 19 | A. No. That would have been |
| 20 | against the wall, too, so you can't get | 20 | consistent with that problem; it was so |
| 21 | back in there. | 21 | hot that you couldn't put it on low. |
| 22 | Q. So there was no doorway or hatch to | 22 | Q. Around the same time. |
| 23 | get into that area? | 23 | A. Yes. |
| 24 | A. Other than the only other doorway | 24 | Q. Prior to the loss, did you ever |

48 (Pages 189 to 192)



**Jack Daniel**
**Court Reporting & Video Services** Inc

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

*EXHIBIT "B"*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. NO. 05-CV-11065

VIGILANT INSURANCE
COMPANY, as subrogee of
JOHN and BARBARA FERRARO,

                    Plaintiffs,

        VS.

PREMIER BUILDERS, INC.,
MILNE PLUMBING AND
HEATING, INC., and SIEMASKO
AND VERBRIDGE, INC.

                    Defendants.

---

### DEPOSITION OF

### BARBARA FERRARO

November 21, 2005
1:30 p.m.

Litchfield Cavo, LLP
6 Kimball Lane, Suite 100
Lynnfield, MA

Cheryl P. Burns, Professional Court Reporter
and Notary Public in and for the
Commonwealth of Massachusetts



Jack Daniel
Court Reporting & Video Services inc

Technologies you can use • Experience you can Trust

141 Portland Street, Suite 200, Boston, Massachusetts 02114
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Fax: 617.557.0040
www.jackdanielreporting.com

57

1      A.  I think they asked that, and I keep
2  it at 62 and the radiant heat was on at a
3  good temperature and I'm sure that
4  everyone wants to point fingers at me, but
5  that wasn't the case, the temperature was
6  right.  And we keep all modes 62 degrees,
7  there is four modes in the thermostat.  I
8  know how to work the thermostat and that
9  was what it was at.
10     Q.  I'm not asking about whether anyone
11 is pointing fingers at you, all I'm asking
12 is were you present at any conversations
13 where people raised as a possibility
14 whether the temperature at the home was
15 kept at a certain level?
16     A.  Maybe with John, but I wasn't there
17 when it first started, no.
18     Q.  At least as far as when you were
19 present for discussions of possible causes,
20 you, Barbara Ferraro, never heard anyone
21 raise as a possibility that the house was
22 kept sufficiently warm.
23     A.  I think maybe people were saying
24 that.  That's what I heard that people

58

1  were saying that.
2      MR. CLARK:  Please just
3  listen to the question.  Just answer that
4  question.  Off the record.
5      (Short break taken.)
6      MR. JAROSAK:  Back on the
7  record.
8      BY MR. JAROSAK:
9      Q.  After the loss, Mrs. Ferraro, were
10 you ever present for any conversations
11 where the issue of the doors to the
12 enclosure were discussed as a possible
13 contributor or cause of the loss?
14     A.  I was not present, but I heard
15 through my husband because he would relay
16 the information to me.
17     Q.  Did you play any role, Mrs.
18 Ferraro, in putting together a list or
19 itemization for the damage to either the
20 home itself or your personal property?
21     A.  Yes.
22     Q.  What role did you play?
23     A.  I had to do the content claim.
24     Q.  Is that somebody where you dealt

59

1  directly with the issuer yourself?
2      A.  It was just a matter of putting it
3  together and finding out what -- I mean,
4  contents, but now I'm finding out it's
5  more than that.  Sometimes it's the
6  cleaning of rugs you put on the claim,
7  too.  I think I just faxed it in.  That
8  was all.
9      Q.  What I just wanted to know is:
10 Did you, yourself, Barbara Ferraro, deal
11 directly with the insurance company person?
12     A.  Once in a while I would have a
13 question for Jim Taglienti and that was
14 about it.  But I think we've only spoken
15 two or three times.
16     Q.  So most of it was paperwork?
17     A.  Yes.
18     Q.  Now, you've moved back into the
19 home?
20     A.  November 4th, yes.
21     Q.  Your husband mentioned there were
22 at least one issue that predated the
23 February 2005 loss that still needs to be
24 addressed and he referenced the leak in

60

1  the chimney area.  Do you recall that
2  testimony?
3      A.  Yes.
4      Q.  To your memory are there any other
5  problems that the house currently has that
6  predate February 2005 other than that leak
7  up by the chimney?
8      A.  That's it.  There is it still some
9  little punch list things but this
10 interfered with the punch list.
11     Q.  Would you still have that list that
12 was still in existence and still had items
13 on it before February of 2005?
14     A.  Yes.
15     Q.  Would there now be some other list
16 or lists as items that need to be
17 addressed still as part of reconstruction?
18     A.  Yes.
19     Q.  And you would have those?
20     A.  Yes.
21     Q.  What else pertaining to either of
22 the construction of the home originally or
23 the repair effort, what documents or
24 things would you have or the Ferraro's

15  (Pages 57 to 60)


**Jack Daniel**
Court Reporting & Video Services
inc.

Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts  02114

| 81 | 83 |
|---|---|
| 1  correct? | 1  conversation from anyone from Premier as |
| 2  A.  Correct. | 2  to how it was that it could have gotten |
| 3  Q.  On a typical morning if you wake up | 3  so cold in that compartment for the pipe |
| 4  the thermostats would be set at 62; is | 4  to freeze? |
| 5  that right, sleeping mode? | 5  A.  Just -- I don't know if we talked |
| 6  A.  Correct. | 6  about the wind; I don't know.  Just -- |
| 7  Q.  When you wake up in the morning, | 7  not really.  Just kind of what -- it |
| 8  would you automatically turn up the heat | 8  froze and that was it.  It was very |
| 9  for your bathroom in your bedroom? | 9  upsetting situation, so it was kind of an |
| 10  A.  Yes. | 10  awkward situation.  You got to understand, |
| 11  Q.  What would you normally turn it to | 11  you know. |
| 12  up to? | 12  Q.  At some time, were you home when a |
| 13  A.  About 70. | 13  Lester MacLaughlin came buy to do an |
| 14  Q.  And you would have no reason to | 14  inspection of the cabinet where the steam |
| 15  turn it up on Clare's and Daniel's side | 15  generator was located? |
| 16  except when you were going to go into | 16  A.  That name doesn't ring a bell. |
| 17  Clare's bathroom? | 17  Q.  Were you home when anyone came by |
| 18  A.  Correct, or if Danny is coming back | 18  to do any kind of investigation of what |
| 19  for the weekend. | 19  was cause in this flooding incident? |
| 20  Q.  And normally you would set it | 20  A.  No. |
| 21  around 70 if you needed to turn it up? | 21  Q.  You never noticed any kind of draft |
| 22  A.  Correct. | 22  inside that cabinet at any time, did you? |
| 23  Q.  But the lowest it would go would be | 23  A.  No. |
| 24  62? | 24  Q.  Are you aware now that there is at |

| 82 | 84 |
|---|---|
| 1  A.  Correct. | 1  least some kind of allegation that there |
| 2  Q.  With regard to conversations you | 2  may have been a draft inside the cabinet, |
| 3  had with any of Premier's people about the | 3  have you heard of any such allegations? |
| 4  flooding incident, can you be as precise | 4  A.  No. |
| 5  as possible as to what you recall any | 5  Q.  The cabinet itself, do you know |
| 6  particular individual from Premier saying | 6  where that cabinet is today? |
| 7  about the cause of the flooding? | 7  A.  The doors -- it's not really a |
| 8  A.  It was just what happened.  It | 8  cabinet. |
| 9  wasn't like we talked about it.  It was | 9  Q.  What word would you use to describe |
| 10  just kind of -- I mean, it was like what | 10  the enclosure where the steam generator |
| 11  I've said already.  That's the basic | 11  was located? |
| 12  thing, that it got cold and that was all. | 12  A.  We call it an alcove with double |
| 13  Q.  Is this a conversation you had with | 13  cabinet doors. |
| 14  Ken Kumph or somebody else? | 14  Q.  And the original alcove, as you |
| 15  A.  Ken Kumph and Butch.  I mean, Butch | 15  call it, is that still in place today or |
| 16  was there kind of more for what we were | 16  has that been removed? |
| 17  going to do next, kind of thing.  But it | 17  A.  It's still there, but it doesn't |
| 18  was just -- I mean, we were just all | 18  have a steam generator in it. |
| 19  upset and that was about it.  Frozen, | 19  Q.  Do you know if it's the same alcove |
| 20  burst, whatever happened; we don't know. | 20  or cabinet that was there before, or was |
| 21  Q.  There is a belief that the pipe may | 21  it reconstructed? |
| 22  have frozen and burst; is that correct? | 22  A.  It was reconstructed.  The old wood |
| 23  A.  Right. | 23  was taken out and new doors put on. |
| 24  Q.  Do you have any memory of any | 24  Q.  What's inside that alcove now? |

21  (Pages 81 to 84)



Jack Daniel
Court Reporting & Video Services inc

Technologies you can use • Experience you can Trust

Direct Dial:       617.557.0039
Toll Free:         866.814.0039
Toll Free Fax:     866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts  02114

*EXHIBIT "C"*

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2
                            Civil Action No. 05-CV-11065
3

4    * * * * * * * * * * * * * * *    *
                                      *           COPY
5    VIGILANT INSURANCE COMPANY AS    *
     SUBROGEE OF JOHN AND BARBARA     *
6    FERRARO,                         *
                                      *
7     Plaintiff,                      *
                                      *
8              vs                     *
                                      *
9    PREMIER BUILDERS, INC.,          *
     MILNE PLUMBING AND HEATING,      *
10   INC. AND SIEMASKO AND            *
     VERBRIDGE, INC.                  *
11                                    *
      Defendants                      *
12                                    *
     * * * * * * * * * * * * * * *    *
13

14

15           DEPOSITION OF SCOTT MILNE,

16   a witness called on behalf of the Plaintiff

17   pursuant to the Massachusetts Rules of Civil

18   Procedure before Laura Naylor, Court Reporter

19   and Notary Public in and for the Commonwealth

20   of Massachusetts, at Litchfield Cavo, LLP,

21   6 Kimball Lane, Suite 100, Lynnfield, MA,

22   on Friday, November 11, 2005, commencing at

23   9:30 a.m.

24

25
```

1    between Milne and the Ferraro's directly?

2        A.    It was my understanding it was between

3    myself and Premier Builders.

4            MR. OKOLITA:  Do we have copy of that

5    contract here?  We were just looking at it.

6            THE WITNESS:  This was an invoice.

7            MR. OKOLITA:  You don't have the contract

8    there?

9            MR. CLARK:  I think the proposal is a

10   couple of pages deeper.

11           (Discussion off the record.)

12   BY MR. OKOLITA:

13       Q.    Let me ask you this, Mr. Milne.  Did you

14   ever get a written contract of any parties, either

15   Milne, Premier, or the Ferraros for this job?

16       A.    I don't believe so, no.

17       Q.    When you were paid, do you know -- for the

18   work at the Ferraro house, do you know how you were

19   paid?

20       A.    I believe the checks came from the

21   Ferraros.

22       Q.    Okay.  Now, with regard to the steam

23   generator, we have been talking about the steam

24   generator also for the master math?

25       A.    No.