UNITED STATES DISTRICT COURT
DISTRICT COURT MASSACHUSETTS

CIVIL ACTION NUMBER:  2005 CV 11065 RWZ

| | |
|---|---|
| VIGILANT INSURANCE COMPANY, | ) |
| as subrogee of | ) |
| JOHN AND BARBARA FERRARO, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| PREMIER BUILDERS, INC. and | ) |
| MILNE PLUMBING AND HEATING, INC., | ) |
| | ) |
| Defendant | ) |

**MEMORANDUM IN SUPPOR OF DEFENDANT, MILNE PLUMBING AND HEATING,
INC.'S, MOTION IN LIMINE TO EXCLUDE
EXPERT TESTIMONY AND CERTAIN EVIDENCE**

**BACKGROUND**

The plaintiff Vigilant Insurance as subrogee of John and Barbara Ferraro seeks damages

as a result of a burst pipe at the Ferraro's residence occurring in February 2004.  The pipe that

froze led to a steam generator.  The steam generator was located in an insulated cabinet.  The

cabinet was built and installed by Premier Builders in an unheated but insulated eaves space.

The cabinet was constructed with a ½ inch gap between the doors to allow heat to migrate from

the adjacent commode room into the cabinet.  There has been various testimony regarding the

construction and insulation of the cabinet.  Ken Kumph, president of Premier Builders, testified

that Premier constructed the cabinet and that the cabinet would be built and insulated to protect

the steam generator from the cold air of the eaves.  See Deposition of Ken Kumph, page 40 - 42,

attached as Exhibit A.

Jeff Fowler was deposed on August 29, 2006. Mr. Fowler testified that the cabinet was reconstructed in January of 2004 due to freezing issues in another area of the house which raised concerns of potential freeze issues in the cabinet.[1] Mr. Fowler testified that the reconstruction consisted of removing the interior panels of the cabinet and then replacing the interior panels after the joints of the cabinet had been sealed.

Lester McLaughlin, a consultant retained by Vigilant Insurance, inspected the cabinet on February 11, 2005 and reported a draft. [2] Mr. McLaughlin photographed the cabinet and described an area of draft coming from the eaves into the cabinet. Two photographs were taken of area of the draft. See Photographs and Consultant Invoice of Lester McLaughlin attached as Exhibit C. Mr. McLaughlin testified at deposition that he felt a cold draft in the cabinet and advised Paul Crestin of Premier Builders of the draft. Mr. Crestin acknowledged that he felt the draft in the cabinet at the McLaughlin inspection. See Deposition of Paul Crestin, page 15 and 21, attached as Exhibit D.

Vigilant's counsel forwarded correspondence to Milne on February 11, 2005 advising that he had been retained to represent Vigilant's subrogation interests and Vigilant may pursue its subrogation rights against Milne. Counsel for Vigilant specifically identified the frozen pipe and requested that it be retained. No similar demand was made with respect to the cabinet in which Vigilant's investigator found the draft. See Correspondence from Attorney Clark to Milne Plumbing and Heating, Inc., attached as Exhibit E.

---

[1] Likewise, Mr. Fowler's deposition transcript has not been received by counsel. The defendant intends to supplement this motion upon receipt of the transcript.

[2] Mr. McLaughlin's deposition transcript has not been received by counsel. The defendant intends to supplement this motion upon receipt of the transcript.

Mr. Ferraro testified that he discussed preserving the areas involved in the loss with Mr. Crestin and that he stressed the importance of not beginning any demolition until the insurance company inspected the premises.  See Deposition Transcript of John Ferraro, page 113-114 attached as Exhibit F.  Mr. Ferraro testified "I'm well-trained and that once something is subject to litigation, you preserve everything."  Id. at page 37.  Mr. Ferraro spoke with counsel of the plaintiff shortly after the loss and was never instructed to save the cabinet.  Id. page 178.

On February 24, 2005, Stephen Fredrickson, P.E., expert for the defendant visited the site at the request of Milne's insurer.  At the time of his inspection, the insulation and plywood that had enclosed the steam generator had been removed.  He was therefore unable to determine the cause of the frozen pipe.  See Report of Steven Fredrickson, attached as Exhibit G.   Photographs taken depict the condition of the steam generator cabinet and eaves area on the date of Mr. Fredrickson's inspection.  Id.

Vigilant had received notice of the loss on February 5, 2005.  See Property Notice Loss attached as Exhibit H.

**I.      Vigilant Insurance Spoliated Evidence**

**a.   Vigilant, as the Subrogee of John and Barbara Ferraro, are Liable for their Insured's Spoliation.**

A subrogated insurer "stands in the shoes" of the insured with respect to claims brought against the alleged tortfeasor.   Liberty Mut. Ins. Co. v. National Consolidated Warehouses, Inc., 34 Mass.App.Ct. 293, 297, 609 N.E.2d 1243 (1993).   If it is determined that Vigilant's insureds the Ferraros spoliated evidence, Milne is entitled to raise this defense.

The Ferraros were the owners of the cabinet in question and as such exercised a degree of

control over it.  The Ferraros hired Premier to restore their house after the loss.  While Mr.

Ferraro is a lay-person, his deposition testimony demonstrates that he was knowledgeable with

regards to need to preserve evidence following the loss.  Mr. Ferraro further took control of

Premier's efforts to begin demolition after the loss.  He testified that he stopped Paul Crestin of

Premier from immediately beginning the restoration process. He advised Mr. Crestin that his

insurer should be involved before any demolition took place.   Mr. Ferraro was not only the

owner of the cabinet in question, but he also demonstrated control over the cabinet as well

knowledge on the issue of spoliation of evidence.  He made sure the area of the loss was

preserved for his insurer to inspect.

**b.   Vigilant, as the Entity with the Most Knowledge Regarding the Evidentiary Importance and Value of the Cabinet had a Duty to Preserve Same.**

Lester McLaughlin on behalf of Vigilant Insurance inspected the cabinet on February 11,

2005.  The photos show the interior of the cabinet.  When Stephen Fredrickson, P.E., expert for

the defendant visited the site 13 days later at the request of Milne's insurer, the cabinet had been

partially demolished.  The insulation and some of the plywood that had enclosed the steam

generator had been removed.  He was therefore unable to determine the cause of the frozen pipe.

Photographs taken depict the condition of the steam generator cabinet and eaves area on the date

of Mr. Fredrickson's inspection.

## ANALYSIS

In determining whether evidence should be excluded on the basis of spoliation, the court should consider the following factors:

> 1) Whether the adverse party was prejudiced by the destruction of evidence; 2) whether the prejudice can be cured; 3) the practical importance of the evidence; 4) whether the destruction was in good or bad faith, and 5) the potential for abuse if the evidence is not excluded or the party is not otherwise sanctioned. **Chapman ex rel. Estate of Chapman v. Bernard's Inc., 167 F.Supp.2d 406, (D.Mass. 2001)**

Milne is prejudiced by the destruction of the cabinet. Milne was denied the opportunity to inspect the cabinet to determine whether it was tightly sealed to prevent drafts. Milne was denied the opportunity to inspect the insulation on the cabinet to determine its R-value: the measure of the insulation's capacity to impede heat loss. Further, Milne was denied the opportunity to inspect the eaves space to assess its condition relative to insulation after the loss. The cabinet is an integral piece of evidence and therefore of practical importance. The prejudice suffered by Milne cannot be cured except by inspection of the cabinet.

The moving party questions whether the spoliation took place in bad faith, as it occurred in setting where the parties responsible were aware of spoliation issues. Mr. Ferraro testified that he was aware of the importance of preserving evidence and even took steps in that regard.

Undoubtedly, Vigilant was aware of the importance of the cabinet as its expert, Lester McLaughlin, had inspected and photographed the cabinet. The fact that the insurer had already retained counsel demonstrates their awareness of the issue.

As stated in Northern Assurance Co. v. Ware, 145 F.R.D. 281, 283 (1993)

Although there is no evidence that Plaintiff here intentionally and maliciously allowed destruction of evidence of causation and origin of the fire, Plaintiff's actions can easily be termed reckless. This is not a case in which the **conduct** of a **lay person**, **inexperienced** in the conduct of litigation, has resulted in the destruction of evidence. This is a case brought by an insurance carrier pursuing its subrogation rights after having paid off its insured's claim. Insurance companies are no strangers to litigation, and it seems likely that Plaintiff had litigation in mind when, very soon after the fire, it had its own expert examine the site. The information provided by Plaintiff's expert made the commencement of litigation a distinct possibility, if not a likelihood. Although insurance companies, no doubt, may be under pressure speedily to conclude their dealings with their insureds, the need to do so does not relieve them from the necessity of acting responsibly with respect to the preservation of relevant evidence when they are in possession of information that makes it likely that litigation will ensue.

Vigilant forwarded correspondence to Milne advising of the potential subrogation and advised Premier to retain the pipe. Vigilant sent an expert to inspect the cabinet yet took no steps to preserve the cabinet despite being aware of its importance.

Vigilant should not gain an advantage in this litigation for the spoliation of the cabinet where Milne has been denied access to a key piece of evidence. Milne requests this court exclude Vigilant from offering evidence of the following at trial as a sanction of spoliation.

### 1. Milne failed to provide a sufficient heat source to the cabinet.

The Ferraros testified that the radiant heat system adjacent to the cabinet was left at 88 degrees. See Deposition of Barbara Ferraro, page 87, attached as Exhibit H. The Expert for Vigilant agrees that heat from the radiant floor would migrate into the cabinet. However, he testified that the cabinet lost more heat than it gained. He could not quantify the heat loss or gain for the cabinet and offered no basis for his testimony other than experience as an architect. Inspection of the cabinet and its insulation is fundamental to this analysis. In order for

the pipe to freeze, the temperature within the cabinet would need ro reach 32 degrees.  Whether sufficient heat is provided by the adjacent commode room direct correlates with the amount of heat lost by the cabinet to the eaves area.  Milne seeks to exclude evidence from Vigilant, including expert or and lay witness testimony, in this regard.

    **2.**   **Milne violated the following provision of the plumbing code: No water supply or drainage piping shall be installed outside of or under a building in an exposed, open or unheated area. For water supply or drainage piping that is installed in an exterior wall, unconditioned space or similar areas that may be directly influenced by freezing temperatures, adequate provision shall be made to protect all pipes from freezing. The protection and covering of water and waste pipes shall be the responsibility of the installing plumber.**

The plaintiff alleges this plumbing code provision was violated.  The pertinent issue as it relates to the statute is whether the pipe was installed in an "unconditioned space" or "area that may be directly influenced by freezing temperatures" without adequate provisions to prevent freezing.  Milne contends the fact the pipe was located in an insulated cabinet with access to a heat source necessarily requires a finding the statute is inapplicable, but the spoliation of the cabinet further enhances this argument in that Milne was denied the opportunity to inspect the cabinet post lost to determine its capacity to be influenced "directly" by freezing temperatures or to make a determination as to the amount of heat that would enter the cabinet from the bathroom. Further, the cabinet was the "adequate provision to prevent freezing" that Milne relied upon. Milne is prejudiced in its defense on this issue by the parties' spoliation.

### 3. Evidence that pipes within the steam generator cabinet were not insulated.

The pipes inside the steam generator cabinet were not insulated.  There has been no testimony that insulation would have prevented the freeze up.  As such, there is no evidence that lack of insulation was the proximate cause of the loss.

Arguments that the pipes within the cabinet would need to be insulated would necessary entail an analysis of the cabinet's insulation and ability to prevent cold air from the eaves area to infiltrate it.  Spoliation of the cabinet has denied Milne the opportunity to conduct any such analysis.  It is too simplistic to allow evidence that additional insulation "may" have prevented the loss without expert testimony in this regard.  Further, the need to insulate pipes located within insulated walls would depend upon the cabinet's insulation and construction.

### 4. Evidence that the steam generator should have been installed in the basement or other location.

Subsequent to the loss, the steam generator was installed in the basement.  Milne expects Vigilant to argue that the generator could have been located in the basement to prevent freezing.  Of course, locating the steam generator in the basement is a subsequent remedial measure and is admissible only to show feasibility.  Rule 407 of the Federal Rules of Evidence defines a subsequent remedial measure as a measure if taken before the loss would have made the injury or harm less likely to occur.  The rule does not require exclusion of subsequent measures to show feasibility, but only where feasibility is controverted.

Since the cabinet has been destroyed, one can only speculate that originally locating the steam generator in the basement would have lessened the likelihood of the loss.  Again, the

sufficiency of the cabinet goes directly to this claim.  Milne relied upon Premier Builders to construct a cabinet that would protect the steam generator and associated piping from exposure to the unheated eaves space.

One of the objectives of Rule 407 is to avoid unfairly prejudicing a party as a jury too easily equates a subsequent remedial measure as an admissions of negligence.  Therefore, such evidence distracts the jury from the proper inquiry of whether the decision to install the steam generator in an insulated cabinet was negligent at the time the decision was made.  Raymond v. Raymond Corp., 938 F.2d 1518, 1523 (C.A.1 (N.H.) 1991).

Milne is unfairly prejudiced if the party who spoliated the evidence enters other evidence that a more feasible alternative was available.


**5.   Evidence that alternative heat sources were available to heat the cabinet.**

The destruction of the cabinet has made heat gain/loss analysis not possible.  The remedial policy behind excluding evidence for spoliation supports excluding evidence that alternative heat sources such as heat tape, a space heater or other similar items, could have been utilized in the cabinet.  Vigilant's expert has have testified that heat entered the cabinet.  Since he could not quantify the heat lost from the commode room to the cabinet, and such analysis is impossible without the cabinet, evidence that alternative heat sources would have prevented the freeze up is patently unfair in light of the spoliation.

## **CONCLUSION**

Wherefore, the defendant Milne Plumbing and Heating, Inc. requests this court allow this motion and exclude the above-cited evidence.  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants upon receipt of notification of same from the court.


/s/ John F. Gleavy
_____
John F. Gleavy, BBO 636 888
Lynch & Lynch
45 Bristol Drive
South Easton, MA  02375
(508) 230-2500



/s/ John F. Gleavy

_____
Francis J. Lynch, III, BBO 308 740
John F. Gleavy, BBO 626 888
Attorneys for Defendants
Lynch & Lynch
45 Bristol Drive
South Easton, MA 02375
(508) 230-2500

EXHIBIT A

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3                          Civil Action No. 05-CV-11065

4    * * * * * * * * * * * * * * * *
                                   *
5    VIGILANT INSURANCE COMPANY AS *
     SUBROGEE OF JOHN AND BARBARA  *
6    FERRARO,                      *
                                   *
7     Plaintiff,                   *
                                   *
8            vs                    *
                                   *
9    PREMIER BUILDERS, INC.,       *
     MILNE PLUMBING AND HEATING,   *
10   INC. AND SIEMASKO AND         *
     VERBRIDGE, INC.               *
11                                 *
      Defendants                   *
12                                 *
     * * * * * * * * * * * * * * * *
13

14

15            DEPOSITION OF KENNETH KUMPH,

16   a witness called on behalf of the Plaintiff

17   pursuant to the Massachusetts Rules of Civil

18   Procedure before Laura Naylor, Court Reporter

19   and Notary Public in and for the Commonwealth

20   of Massachusetts, at Premier Builders, Inc.

21   113 Jewett Street, Georgetown, MA, on Thursday,

22   November 10, 2005, commencing at 9:30 a.m.

23

24

25

1    that could lead to freezing; correct?

2            MR. GLEACY:  Objection.

3            THE WITNESS:  I don't know.

4    BY MR. CLARK:

5        Q.    They were concerned about a lack of heat;

6    correct.

7        A.    Correct.

8        Q.    And in the construction industry a lack of

9    heat for a water line, the hazard that is associated

10   with that lack of heat is potential freezing;

11   correct?

12       A.    Correct.

13       Q.    Now, we have just talked about the

14   placement of the generator in the eve space.  During

15   the construction project were you aware of any

16   discussions of work that was done in order to protect

17   the steam generator or the lines run to the steam

18   generator from freezing since it was going to be

19   placed in the eve?

20       A.    Yes.

21       Q.    What are you aware of those conversations?

22   What do you know?

23       A.    Again, I was not on site during the

24   conversations.  It was decided that an enclosure

25   would be built around that area, insulated in

41

1    actually three ways with a plywood and 2 x 4 box

2    enclosure with two-inch rigid styrofoam insulation,

3    and with ten-inch fiberglass insulation wrapped

4    around that as well so that the eve vent did not

5    allow contact, allow air to come into that area.

6         It was also suggested by Jody and Scott

7    that a louvered door opening be put in so that air

8    from the bathroom would be allowed to go into that

9    space to give it some balance with the temperature in

10   the bathroom. That was denied by Mrs. Ferraro as not

11   being in tune with the rest of the detailing of the

12   house.

13        Q.   Let's talk about the construction of this

14   enclosure. So within the eve space it was decided

15   that there would be a -- I'm sorry.

16        Along the wall of the commode room on the

17   right-hand side as you look at the bottom of the plan

18   there was the decision made that you would cut into

19   that wall; correct?

20        A.   Correct.

21        Q.   And that you would build an enclosure for

22   the steam generator and the pipes; correct?

23        A.   Correct.

24        Q.   Who came up with that plan, if you know?

25        A.   I don't know.

42

1          Q.   Who provided the specifications for that

2     plan?  I mean, who designed the enclosure, how much

3     installation?

4          A.   I believe that it was a discussion on site

5     at the time and not a written detail.

6          Q.   Who actually constructed the enclosure?

7          A.   I don't know specifically.

8          Q.   Would that have been Premier's workers who

9     would have constructed that enclosure?

10          A.   Yes.

11          Q.   As I understand it this enclosure, it had 2

12     x 4's'; correct?

13          A.   Yes.

14          Q.   Which is the framing for this enclosure;

15     correct?

16          A.   Correct.

17          Q.   And then plywood.  The plywood and then

18     2-inch foam, 2-inch foam insulation?

19          A.   Yes.

20          Q.   Did the insulation go on the inside or the

21     outside of the enclosure?

22          A.   The outside.

23          Q.   The outside of the enclosure.  And then you

24     were putting the fiberglass insulation also?

25          A.   Correct.

EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
05 11065 RWZ

VIGILANT INSURANCE COMPANY, as        )
subrogee of JOHN and BARBARA FERRARO  )
            Plaintiff        )
                             )
            VS.               )
                             )
PREMIER BUILDERS, INC. and            )
MILNE PLUMBING AND HEATING, INC.      )
            Defendants       )

## RESPONSE OF DEFENDANT, PREMIER BUILDERS, INC.,
## TO PLAINTIFF'S REQUEST FOR ADMISSIONS

Request 1.
On February 11, 2005, there was a draft of air from the eave into the steam generator cabinet.

Response 1.
The defendant has insufficient facts to either admit or deny the truthfulness of the allegations contained in Request 1.

Request 2.
The draft was discovered by Lester MacLaughlin.

Response 2.
The defendant has insufficient facts to either admit or deny the truthfulness of the allegations contained in Request 2.

Request 3.
The draft existed before February 4, 2005.

Response 3.
The defendant denies the allegations contained in Request 3.

Request 4.
The steam generator had a 3/8 inch water supply line running in the steam generator cabinet supplying water to the steam generator.

Response 4.
The defendant admits the allegations contained in Request 4.

Request 5.
 The 3/8 inch water supply line froze.

Response 5.
 The defendant has insufficient facts to either admit or deny the truthfulness of the allegations contained in Request 5.

Request 6.
 The temperature in the steam generator closet reached 32°F or below before February 4, 2005.

Response 6.
 The defendant has insufficient facts to either admit or deny the truthfulness of the allegations contained in Request 6.

Request 7.
 The temperature was able to reach 32°F or below in the steam generator closet because of the draft that was discovered on February 11, 2005 by Lester MacLaughlin.

Response 7.
 The defendant denies the allegation contained in Request 7.

Request 8.
 Mr. MacLaughlin showed Paul Crestin the draft.

Response 8.
 The defendant denies the allegation contained in Request 8.

Request 9.
 The steam generator could have been installed in the basement during construction of the property.

Response 9.
 The defendant admits the allegation contained in Request 9.

Request 10.
 During the installation of the steam generator during the construction of the property, Milne was responsible for controlling where the steam generator was to be installed.

Response 10.
 The defendant admits the allegation contained in Request 10.

Request 11.
     During the installation of the steam generator during the construction of the property, Premier was responsible for controlling where the steam generator was to be installed.

Response 11.
     The defendant denies the allegation contained in Request 11.

Request 12.
     During the installation of the steam generator during the construction of the property, it was feasible for the steam generator to be located in the basement.

Response 12.
     The defendant admits the allegation contained in Request 12.

Request 13.
     The steam generator cabinet was not sealed.

Response 13.
     The defendant has insufficient facts to either admit or deny the truthfulness of the allegation contained in Request 13.

Request 14.
     The steam generator cabinet could have been sealed using a polyurethane foam sealant.

Response 14.
     The defendant admits the allegation contained in Request 14.

Request 15.
     If the steam generator cabinet had been sealed with a polyurethane foam sealant, the temperature inside of the steam generator cabinet would not have reached 32°F or below.

Response 15.
     The defendant denies the allegation contained in Request 15.

Request 16.
     If the temperature in the steam generator cabinet was above 32°F, the 3/8 inch water supply line would not have frozen.

Response 16.

The defendant has insufficient facts to either admit or deny the truthfulness of the allegation contained in Request 16.

Request 17.

The lowest recorded temperature reached in Gloucester, Massachusetts, from the time of the installation of the steam generator to February 4, 2005 occurred on January 22, 2005.

Response 17.

The defendant has insufficient facts to either admit or deny the truthfulness of the allegation contained in Request 17.

Request 18.

From January 22, 2005 until February 4, 2005 the thermostat for the forced air heat for the zone covering Clare's bathroom was set at 62°F.

Response 18.

The defendant has insufficient facts to either admit or deny the truthfulness of the allegation contained in Request 18.

Request 19.

From January 22, 2005 until February 4, 2005 the thermostat for the radiant for Clare's bathroom was set at 88°F or higher.

Response 19.

The defendant has insufficient facts to either admit or deny the truthfulness of the allegation contained in Request 19.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS

2nd DAY OF December , 2005.

PREMIER BUILDERS, INC.
By:

KENNETH A. KUMPH, President

## CERTIFICATE OF SERVICE

I hereby certify under the pains and penalties of perjury that I have on this day served a copy of the foregoing:

### ANSWERS OF DEFENDANT, PREMIER BUILDERS, INC. TO INTERROGATORIES PROPOUNDED BY THE PLAINTIFF, VIGILANT INSURANCE COMPANY, as subrogee of JOHN AND BARBARA FERRARO

by mailing a copy of same postage prepaid to:

William N. Clark, Jr., Esquire
COZEN O'CONNOR
The Atrium – Third Floor
1900 Market Street
Philadelphia, PA  91903

Patrick J. Loftus, III, Esquire
9 Park Street
Boston, MA  02127
**Attorneys for the Plaintiffs**

John F. Gleavy, Esquire
Lynch & Lynch
45 Bristol Drive
South Easton, MA  02375
**Attorney for the Co-Defendant, Milne Plumbing and Heating, Inc.**

John J. Jarosak, Esq.
Litchfield & Cavo
6 Kimball Lane
Lynnfield, MA 01940
**Attorney for Siemasko & Verbridge, Inc.**

Michael E. Okolita, Esquire  (l.c.)
Donald E. Feener & Associates
120 Front Street, Suite 310
Worcester, MA 01608-1424
(508) 798-0717
BBO: 378255
Dated:  December 5, 2005

EXHIBIT C

# J. LESTER MACLAUGHLIN & CO., INC. *Contractors and Engineers*

PLUMBING ☆ HEATING ☆ GAS FITTING ☆ SPRINKLER SYSTEMS ☆ SHEET METAL WORK ☆ AIR CONDITIONING

365 Ferry Street, Everett, Massachusetts 02149-P.O. Box 86

Phone (617) 387-4058 - (617) 387-4059
Fax (617) 387-3319

Established 1929

March 18, 2005
Barbara and John Ferraro
Page 11



Area of draft

in closet



Area of draft

in closet

# J.L. MACLAUGHLIN & CO., INC.

# Invoice

365 FERRY STREET
P.O. Box 490096
EVERETT, MA 02149
(617) 387-4058 FAX # (617) 387-3319

| Date | Invoice # |
|------|-----------|
| 2/23/2005 | 8292 |

| Bill To |
|---------|
| Cozen & O'Connor |
| The Atrium |
| 1900 Market Street |
| Philadelphia, PA 19103 |
| Attn: Atty. William Clark |

| Description | Amount |
|-------------|--------|
| RE:  BARBARA AND JOHN FERRARO | |
|         136 HESPERUS AVE. | |
|         GLOUCESTER, MA | |
| | |
|         TRAVEL TO GLOUCESTER, MA. | |
|         INSPECT LOSS. | |
|         CONSULT WITH ATTY. CLARK | |
| | |
|         4.0 HOURS @ $100.00 | 400.00 |
|         50 Miles @ .50 | 25.00 |
| CONSULTING | 0.00 |

| **Total** | **$425.00** |

EXHIBIT D

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS

2
                              Civil Action No. 05-CV-11065
3

4    * * * * * * * * * * * * * * * *
                                    *
5    VIGILANT INSURANCE COMPANY AS  *
     SUBROGEE OF JOHN AND BARBARA   *
6    FERRARO,                       *
                                    *
7     Plaintiff,                    *
                                    *
8           vs                      *
                                    *
9    PREMIER BUILDERS, INC.,        *
     MILNE PLUMBING AND HEATING,    *
10   INC. AND SIEMASKO AND          *
     VERBRIDGE, INC.                *
11                                  *
      Defendants                    *
12                                  *
     * * * * * * * * * * * * * * * *

13

14

15          DEPOSITION OF PAUL CRESTIN,

16   a witness called on behalf of the Plaintiff

17   pursuant to the Massachusetts Rules of Civil

18   Procedure before Laura Naylor, Court Reporter

19   and Notary Public in and for the Commonwealth

20   of Massachusetts, at Premier Builders, Inc.

21   113 Jewett Street, Georgetown, MA, on Thursday,

22   November 10, 2005, commencing at 4:00 p.m.

23

24

25

15

1  you felt coming into that cabinet area?

2       A.    At that point, no.

3       Q.    At some point did you feel a draft come

4  into that cabinet area?

5       A.    I believe it was after some stuff had been

6  removed.

7       Q.    What stuff had been removed?  Okay.  So you

8  did at some point feel a draft come into that cabinet

9  area; is that correct?

10       A.    Yes.

11       Q.    When did you feel that draft?

12       A.    I believe it was in the later visits to the

13  house.

14       Q.    And you say stuff had been removed.  What

15  had been removed, or what do you think had been

16  removed before you felt the draft?

17       A.    I think it had been the point at which they

18  started doing some of the remediation for water

19  damage.

20       Q.    That first day, did you -- was there, did

21  you notice whether there an access panel in the

22  cabinet that allowed you access into the eve area?

23       A.    I do not recall.

24       Q.    You didn't open that access panel, did you

25  that day?

21

1      A.   Again, I do not know.

2      Q.   Did Mr. McGlofflin point out a draft to

3  you?

4      A.   He indicated that it felt cold in that

5  cabinet.

6      Q.   And I guess at that point is when you first

7  noticed the draft and you also believed it felt cold?

8      A.   Yes.

9      Q.   Did you make a determination as to where

10  that draft was coming from?

11      A.   Not specifically.

12      Q.   Was it coming from the bottom or the top of

13  the cabinet?

14      A.   Again, I am not sure on the exact location.

15      Q.   I am going to show you some photographs

16  previously we have marked as Exhibit No. 11.  I am

17  going to show you photographs from Page No. 11.  I

18  will represent to you that is the inside of the

19  cabinet.

20          Do you recognize that as the inside of the

21  cabinet?

22      A.   Yes.

23      Q.   This would be the top portion of the

24  cabinet?

25      A.   Yes.

EXHIBIT E

PHILADELPHIA
ATLANTA
CHARLOTTE
CHERRY HILL
CHICAGO
DALLAS
DENVER
HOUSTON
LAS VEGAS
LONDON
LOS ANGELES

NEW YORK
NEWARK
SAN DIEGO
SAN FRANCISCO
SEATTLE
TRENTON
WASHINGTON DC
WEST CONSHOHOCKEN
WICHITA
WILMINGTON

# COZEN
# O'CONNOR
ATTORNEYS

A PROFESSIONAL CORPORATION

1900 MARKET STREET    PHILADELPHIA, PA 19103-3508    215.665.2000    800.523.2900    215.665.2013 FAX    www.cozen.com

February 11, 2005

William N. Clark, Jr.
Direct Phone 215.665.4101
Direct Fax    215.701.2401
wclark@cozen.com

VIA FACSIMILE: 978-526-8118 & CERTIFIED MAIL - RRR
Milne Plumbing & Heating
7 Beaver Dam Road
Manchester, MA 01944-1296

RE:    Insured:         John Ferraro
       Loss Location:   136 A Hesperus Avenue, Gloucester, MA
       Date of Loss:    2/5/05
       Policy No.:      001200873101
       Our File No.:    Pending

Dear Sir/Madam:

Please be advised that I have been retained to represent the subrogation interests of the Chubb Group of Insurance Companies with respect to the February 5, 2005 water loss at the home of John and Barbara Ferraro located at 136 A Hesperus Avenue, Gloucester, Massachusetts 01930. The investigation conducted to date has determined that the water leak was caused by the freezing of a domestic water line running to the bathroom. We are writing this letter to provide your company with notice that Chubb may pursue its subrogation rights against your company and other entities involved with the design and construction of the residence.

It is my understanding that Paul Krestin (project manager for Premier) has retained the frozen pipe. We request that the pipe be maintained, unaltered until farther notice.

Please forward a copy of this letter to your insurance company with instructions to contact me.

Sincerely,

COZEN O'CONNOR

By    William N. Clark, Jr.

WNC/ccg

EXHIBIT F

## Copy of Transcript

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. NO. 05-CV-11065

VIGILANT INSURANCE
COMPANY, as subrogee of
JOHN and BARBARA FERRARO,

Plaintiffs,

VS.

PREMIER BUILDERS, INC.,
MILNE PLUMBING AND
HEATING, INC., and SIEMASKO
AND VERBRIDGE, INC.

Defendants.

### DEPOSITION OF

### JOHN FERRARO

November 21, 2005
9:30 a.m.

Litchfield Cavo, LLP
6 Kimball Lane, Suite 100
Lynnfield, MA 01940-2682

Cheryl P. Burns, Professional Court Reporter
and Notary Public in and for the
Commonwealth of Massachusetts



### ack Daniel
#### Court Reporting & Video Services
Inc

Technologies you can use • Experience you can Trust

141 Portland Street, Suite 200, Boston, Massachusetts 02114
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Fax: 617.557.0040
www.jackdanielreporting.com

2

1    <u>A P P E A R A N C E S :</u>

2

3    **ON BEHALF OF  PLAINTIFFS:**

4    WILLIAM N. CLARK, JR., ESQ.

5        Cozen O'Connor

6        1900 Market Street

7        Philadelphia, PA 19103-3508

8        215.665.4101

9        wclark@cozen.com

10

11    **ON BEHALF OF SIEMASKO AND VERBRIDGE, INC.:**

12    JOHN J. JAROSAK, ESQ.

13        Litchfield Cavo, LLP

14        6 Kimball Lane

15        Suite 100

16        Lynnfield, MA 01940-2682

17        781.309.1500

18        jarosak@litchfieldcavo.com

19

20

21

22

23

24


**Jack Daniel**
**Court Reporting & Video Services** Inc

Technologies you can use • Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

37

1  computer to the extent that I have them

2  still.

3      Q.  Would you agree, Mr. Ferraro, not

4  to permanently delete in any fashion the

5  e-mails that are on your computer, either

6  your home computer or your office

7  computer, that have anything to do with

8  the property?

9      A.  Yes.  Obviously I'm well trained

10  and that once something is subject to

11  litigation, you preserve everything.

12      Q.  During any of the preliminary

13  meetings that you attended that Siemasko

14  and Verbridge was present -- by

15  "preliminary," I mean before pouring the

16  foundation of your new home -- was there

17  any discussion that you were privy to

18  having to do with the plumbing systems?

19      A.  Not that I recall.

20      Q.  Once construction started, in other

21  words, once they started pouring the

22  foundation, from that point until the home

23  was completed, did you attend any on-site

24  meetings where anyone from Siemasko and


**Jack Daniel**
**Court Reporting & Video Services** Inc

Technologies you can use • Experience you can Trust

Direct Dial:       617.557.0039
Toll Free:         866.814.0039
Toll Free Fax:     866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

113

1  Milne where the cause was discussed?

2      A.  You know, I don't recall having any

3  conversations that day and if they were,

4  they would have been fairly close to that

5  day.  So I don't recall having a

6  discussion with Scott.  I could have, but

7  I don't recall any.

8      Q.  You mentioned that Paul from

9  Premier was there.  Was that Paul Cresten?

10     A.  I don't know Paul's last name.  I

11  think he goes by the name of Butch more

12  than anything.

13     Q.  Did you have any discussion with

14  Paul that day, that Saturday, about the

15  situation?

16     A.  Yes.

17     Q.  What did you say to him and what

18  did he say to you as best you can recall?

19     A.  Well, Paul was very anxious to get

20  a truck in and do the demolition and put

21  it back right away.  And I said, Paul,

22  let's calm down a little bit.  We've got

23  to figure out what we've got to do.  I

24  don't want you ripping things out before


**Jack Daniel**
Court Reporting & Video Services Inc

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

114

1  we get the insurance people in here.

2       I remember being very anxious

3  because even the Clean Pro people wanted

4  to take all the walls down and dry out

5  the stuff and I said, You can't.  And

6  even stuff that looked good they said if

7  you don't get it, you're going to have

8  mold.  I said, I want the insurance people

9  here before we touch anything.

10      So I remember having that

11  discussion with Paul being concerned, that

12  he wanted to jump the gun about getting

13  things done.  I think he was feeling bad

14  and wanted to put the house back as soon

15  as possible.  So that was the tenure of

16  the discussions with Paul.

17    Q.  Did you contact anyone from

18  Siemasko and Verbridge that first weekend,

19  Mr. Ferraro?

20    A.  I can't remember when Thad came

21  over or when he found out.  I can't

22  remember if I told him or Ken.  I can't

23  remember.  But I do know he did find out

24  and felt bad about it.



**JACK Daniel**
Court Reporting & Video Services
Inc

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

178

```
 1     A.  I don't recall, but it wasn't long

 2  after the loss when I got a letter from

 3  Attorney Clark requesting some help and

 4  notifying me of the obligation under the

 5  insurance policy.

 6     Q.  At that time, did you understand

 7  that he was representing the insurance

 8  company?  What was your understanding?

 9     A.  Yes.

10     Q.  He didn't represent you, did he?

11     A.  No.

12     Q.  What did that letter have to say

13  about things that you had to do?

14     A.  He just basically referred me to

15  the policy requirement that I was

16  obligated to cooperate in the connection

17  with producing documents, testifying, etc.

18     Q.  Were you ever instructed by anyone

19  to save the cabinet where this steam

20  generator was located?

21     A.  No.

22     Q.  In the year prior -- the winter

23  prior to the loss, you talked in some

24  detail about some freezing issues.  Was
```



**JACK Daniel**
Court Reporting & Video Services
Inc
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts  02114

EXHIBIT G

Date:    May 15, 2005
RE:      136 Hesperus Street, Gloucester, MA
         Assessment of Cause of Water Damage

On February 24, 2005 I conducted an inspection of the above referenced property for the purpose of determining the cause of interior water damage. The structure is a new 1 ½ story, wood-framed, single family dwelling. The main roof is gable-framed. The roof slopes down to the front and rear.

The rear of the property abuts the ocean. The property is elevated high above sea level, making is susceptible to high winds.

There is a bathroom on the second floor, under the sloped roof at the front of the house. There is a steam room in the bathroom, and the steam generator is located in the kneewall space under the sloped ceiling to the front of the steam room. The steam generator was enclosed with a wood stud wall compartment, sheathed with plywood on all sides. The compartment was then insulated with rigid insulation.

A copper water supply pipe that feeds the steam generator recently burst, causing water damage in the house. I was shown a piece of the failed pipe and there is a small section that has split. It appears clear that this split is due to a frozen line.

At the time of my inspection, damaged areas were in the process of being repaired. Damaged wall, floor and ceiling surfaces had been removed, and the insulation and plywood that enclosed the steam generator had been removed. I was therefore unable to determine the cause of the frozen line.

I recently received copies of photographs that were taken immediately following discovery of the leak, prior to the start of repairs. The photographs appear to show a gap in the rigid insulation that enclosed the steam generator, where the rear wall panel meets the ceiling panel.

Also, it appears that the supply pipe in the wood enclosure was not insulated.

There are soffit vents and ridge vents to ventilate the unconditioned crawlspace. There are foam baffles below the roof sheathing in the sloped roof to allow air to flow from the soffit vents up to the ridge vents. The baffles prevent the fiberglass insulation in the sloped roof from blocking the air flow. This is all standard construction practice, in accordance with the Massachusetts State Building Code.

Conclusions: It is clear that the water supply pipe that feeds the steam generator in the second floor front bathroom froze and burst. The line appears to have frozen due to high winds that entered the soffit vents and dislodged the roof fiberglass batt insulation. The

136 Hesperus Street, Gloucester, MA
Assessment of Cause of Water Damage

Page 2
May 15, 2005

winds then were able to enter the steam generator enclosure through a gap in the rigid
insulation that enclosed the unit.

While a good effort was made during construction to insulate the steam generator unit,
the effort does not appear to have been adequate. The exposure of the house to high
winds necessitated a higher than normal effort to protect against cold and high winds.
The fiberglass batts between the rafters should have been more securely fastened so that
they did not blow loose, and any gaps in the enclosure around the steam generator should
have been sealed. As an addition precaution, in hindsight, the supply pipe in the
enclosure should also have been insulated.

I hope that this addresses all of your concerns. If I can be of additional help, please
contact me.

Sincerely,

Steven R. Frederickson, P.E.

136 Hesperus Street, Gloucester, MA
Assessment of Cause of Water Damage

Page 4
May 15, 2005



Photo 3- View of steam generator. Plywood and rigid insulation has been removed



Photo 4 - View of split water supply line

136 Hesperus Street, Gloucester, MA
Assessment of Cause of Water Damage

Page 5
May 15, 2005



Photo 5 - View of crawlspace enclosure to let of steam generator



Photo 6 - Typical view of sloped ceiling baffles and insulation. Insulation has been pushed back for
repairs

136 Hesperus Street, Gloucester, MA
Assessment of Cause of Water Damage

Page 3
May 15, 2005



Photo 1- Front view of 136 Hesperus Street, Gloucester, MA



Photo 2 - View of kneewall space where steam generator is located

EXHIBIT H

# PROPERTY
## Loss Notice

| | | | | | |
|---|---|---|---|---|---|
| Policy Number: | 001200873101 | Effective Date: | 09/27/2004 | Expiration Date: | 09/27/2005 |
| Reference #: | 040505014061 | IRIS Entry Date: | 02/05/2005 | Date Chubb Received: | 02/05/2005 |
| Date of Loss: | | 02/05/2005 | Time of Loss: | | |
| Loss Type: | Property | | Cause of Loss: | Water | |
| Input Type: | Call | | | | |
| Filing Name: | FERRARO | | | | |

Producer

| | | | |
|---|---|---|---|
| Number: | 0038561 00146 | Name: | CHUBB INSURANCE SOLUTIONS AGENCY INC (CAP/NTE) |
| Address: | 31 MILK STREET-ROOM 1020 | | |
| | BOSTON, MASSACHUSETTS 08889-1625 UNITED STATES | | |
| Phone: | (800)800-3770 | Fax: | (800)248-2259 |

Insureds

JOHN FERRARO

Contacts

Primary Contact(s):

Barbara Ferraro

(General Loss Information

| | |
|---|---|
| Loss Description: | Insured states that pipe burst and caused extensive water damage. Insured has already called restorative service. |
| Loss Location: | 136A HESPERUS AVE GLOUCESTER, MASSACHUSETTS 01930 County: ESSEX UNITED STATES |
| Building Damaged: | Yes |

Water Details

| | |
|---|---|
| Cause of Damage: | Plumbing/Pipe Break |

Property Damages

| Type | Estimated Value | Repair Status |
|---|---|---|
| Building | $0.00 | |

Reported By

Barbara Ferraro

Relationship to insured: Member of Insured House

Addresses and Phones

Name: JOHN FERRARO

| Address | | Type |
|---|---|---|
| 136 HESPERUS AVE GLOUCESTER, Massachusetts 01930 United States | | |
| Roles: | Claimant, Insured | |

Name: Barbara Ferraro

| Address | | Type |
|---|---|---|
| United States | | |
| Phone | | Type |

(978)525-3625                              Business - Voice (Preferred)
(917)691-4268                              Mobile

Roles:        Contact,  Reported By

 Loss Assigned to Branch

ECSC PROPERTY NE
P.O. Box 4700
Chesapeake, VA 23327-4700
(800)252-4670

# EXHIBIT I

## Condensed Transcript

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. NO. 05-CV-11065

VIGILANT INSURANCE
COMPANY, as subrogee of
JOHN and BARBARA FERRARO,

          Plaintiffs,
   VS.

PREMIER BUILDERS, INC.,
MILNE PLUMBING AND
HEATING, INC., and SIEMASKO
AND VERBRIDGE, INC.

        Defendants.

---

### DEPOSITION OF

### BARBARA FERRARO

November 21, 2005
· 1:30 p.m.

Litchfield Cavo, LLP
6 Kimball Lane, Suite 100
Lynnfield, MA

Cheryl P. Burns, Professional Court Reporter
and Notary Public in and for the
Commonwealth of Massachusetts



Technologies you can use • Experience you can Trust

141 Portland Street, Suite 200, Boston, Massachusetts 02114
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Fax: 617.557.0040
www.jackdanielreporting.com

87

1    A.  It's inside a cupboard in her

2  dressing area closet.

3    Q.  If one was to look at that, is

4  there some sort of digital print out as to

5  what it's set at?

6    A.  Yes, you'd have to go inside the

7  mode to see what the temperature it's set

8  at.

9    Q.  What's your best believe at to what

10  it was set at prior to this loss?

11    A.  I would venture to say, 88.

12    Q.  There has been a discussion before

13  with you having a conversation with Scott

14  Milne about the radiant heating settings,

15  and he said something to you to the effect

16  don't change it; is it fair to say?

17    A.  Yes.

18    Q.  Once you he told you that, did you

19  ever change it?

20    A.  No more than one or two degrees, a

21  minor adjustment.

22    Q.  But certainly you never turned it

23  off or ever set it down?

24    A.  No.



**Jack Daniel**
Court Reporting & Video Services Inc

Technologies you can use • Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:      866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114

88

1    Q.   What's the lowest it can go?

2    A.   I never even looked actually.

3    Q.   So as far as you know, it's your

4 understanding that while the family was

5 away when this incident occurred, the

6 temperature setting for the forced hot air

7 in Clare's half of the house where her

8 bathroom is was 62 degrees?

9    A.   Correct.

10    Q.   The floor setting you believe was

11 somewhere around 88 degrees?

12    A.   Or higher.

13    Q.   And you have no reason to believe

14 that wasn't the case?

15    A.   Correct.

16    Q.   Because you're aware that there was

17 no cold temperature alarm that went off?

18    A.   Right, there isn't.

19    Q.   And the winter before the loss,

20 Clare was away again, right, she was

21 living in New York?

22    A.   Right.

23    Q.   Daniel, aside from coming home on a

24 weekend or Christmastime, he would have


**Jack Daniel**
Court Reporting & Video Services Inc

Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

141 Portland Street, Suite 200
Boston, Massachusetts 02114